## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| **ISAAC INDUSTRIES, INC.**, on behalf of itself and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>**AAA COOPER TRANSPORTATION; ARKANSAS BEST CORPORATION; ABF FREIGHT SYSTEMS, INC.; AVERITT EXPRESS, INC.; CON-WAY FREIGHT, INC.; ESTES EXPRESS LINES, INC.; FEDEX CORPORATION; FEDEX FREIGHT CORPORATION; FEDEX NATIONAL LTL, INC.; JEVIC TRANSPORTATION, INC.; OLD DOMINION FREIGHT LINE, INC.; OVERNITE CORPORATION; ROADWAY EXPRESS, INC.; R+L CARRIERS, INC.; SAIA, INC.; SAIA MOTOR FREIGHT LINE, LLC; SOUTHEASTERN FREIGHT LINES, INC.; SUN CAPITAL PARTNERS IV, LLC; UNITED PARCEL SERVICE, INC.; WATKINS MOTOR LINES; YELLOW TRANSPORTATION, INC.; YRC REGIONAL TRANSPORTATION, INC.; and YRC WORLDWIDE, INC.,**<br><br>Defendants. | Civil Action No. 07-1638 (RBW) |

## NOTICE OF FILING

PLEASE TAKE NOTICE that counsel for Isaac Industries, Inc. filed the attached Motion to Transfer and for Pre-Trial Coordination or Consolidation of Related Actions to the District of Columbia, Memorandum of Points and Authorities in Support thereof, Revised MDL Certificate of Service and Schedule of Actions, and Complaint in *Isaac Industries, Inc. v. AAA Cooper*

*Transportation, et al.,* Case No. 07-01638 (D.D.C.) (entry #1 to this current docket) with the

Panel on Multidistrict Litigation ("MDL") on September 18, 2007

Dated: September 27, 2007.

Respectfully submitted,

**BOIES, SCHILLER & FLEXNER LLP**

By:    _____

Richard B. Drubel, Jr. (D.C. Bar No. 334359)
Tanya Chutkan (D.C. Bar No. 420478
5301 Wisconsin Avenue, NW
Washington, DC 20015
Telephone:  (202) 237-2727
Fax:  (202) 237-6131
E mail:  rdrubel@bsfllp.com
         Tchutkan@bsfllp.com

**KAPLAN, FOX & KILSHEIMER, LLP**

Robert N. Kaplan
Linda P. Nussbaum (D.C. Bar No. 483254)
Gregory K. Arenson
850 Third Avenue, 14th Floor
New York, NY 10022
Telephone:  (212) 687-1980
Fax:  (212) 687-7714
E mail:  rkaplan@kaplanfox.com
         lnussbaum@kaplanfox.com
         garenson@kaplanfox.com

H. Laddie Montague, Jr.
Eric L. Cramer
**BERGER & MONTAGUE, P.C.**
1622 Locust Street
Philadelphia, PA 19103
Telephone: (215) 875-3009
Fax: (215) 327-9583
E mail:  hlmontague@bm.net
         ecramer@bm.net

Michael E. Criden
Kevin B. Love
**HANZMAN, CRIDEN & LOVE, P.A.**
7301 S.W. 57th Court, Suite 515
South Miami, FL 33143
Telephone: (305) 357-9010
Fax: (305) 357-9050
E mail: mcriden@hanzmancriden.com
          klove@hanzmancriden.com

## CERTIFICATE OF SERVICE

I hereby certify that on September 27, 2007, a copy of the foregoing Notice of Errata was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's Electronic Filing system. Parties may access this filing through the Court's system.

Tanya Chutkan (D.C. Bar No. 420478)
**BOIES SCHILLER & FLEXNER LLP**
5301 Wisconsin Avenue, NW
Washington, DC 20015
Telephone: (202) 237-2727
Fax: (202) 237-6131
E mail: Tchutkan@bsfllp.com

RECEIVED
CLERK'S OFFICE

2007 SEP 18  P 12: 53

JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

## BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

| | | |
|---|---|---|
| IN RE LTL TRUCKING ANTITRUST LITIGATION | : : : : : | MDL No. _____ |

## ISAAC INDUSTRIES, INC.'S MOTION TO TRANSFER AND FOR PRE-TRIAL COORDINATION OR CONSOLIDATION OF RELATED ACTIONS TO THE DISTRICT OF COLUMBIA PURSUANT TO 28 U.S.C. § 1407

As set forth in its supporting Memorandum, Isaac Industries, Inc. ("Isaac Industries"),

plaintiff in an action entitled *Isaac Industries, Inc. v. AAA Cooper Transportation, et al.*, Case

No. 07-01638  (D.D.C.), respectfully moves this Panel for an order, pursuant to 28 U.S.C. §

1407 transferring eleven presently-filed antitrust class actions to the District of Columbia for

pretrial consolidation or coordination. Each of these actions alleges violations of federal antitrust

law through a conspiracy to fix the prices of fuel surcharges applied in the less-than-truckload

("LTL") freight shipping industry. (A list of actions to be transferred is annexed as Appendix

A). Centralization is appropriate because these actions involve common issues of fact and law,

and are brought against a largely overlapping group of LTL freight transportation services providers.

Isaac Industries submits that the most appropriate venue for these cases is the District of Columbia. The District of Columbia possesses the strongest nexus to this action, most notably through its proximity to several important non-party witnesses, including the trade organizations under whose auspices the defendants are alleged to have met and conspired. In addition, the District of Columbia is also the most geographically convenient forum, as a major transportation hub that is readily accessible by the majority of defendants clustered in the eastern and southeastern United States.

Isaac Industries anticipates that other complaints may be filed containing similar allegations. It therefore respectfully requests that any subsequently-filed actions be treated as tag-along actions under Rule 7.4 of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation, subject to consolidation in the same venue as these actions in order to "promote the just and efficient conduct of the cases." 28 U.S.C. § 1407.

Dated: September 18, 2007.

Respectfully submitted,

BOIES, SCHILLER & FLEXNER LLP

By: _____
Richard B. Drubel, Jr. (D.C. Bar No. 334359)
Tanya Chutkan (D.C. Bar No. 420478)
5301 Wisconsin Avenue, NW
Washington, DC 20015
Telephone: (202) 237-2727
Fax: (202) 237-6131
E mail: rdrubel@bsfllp.com
            Tchutkan@bsfllp.com

**KAPLAN, FOX & KILSHEIMER, LLP**

Robert N. Kaplan
Linda P. Nussbaum (D.C. Bar No. 483254)
Gregory K. Arenson
850 Third Avenue, 14th Floor
New York, NY 10022
Telephone: (212) 687-1980
Fax: (212) 687-7714
E mail: rkaplan@kaplanfox.com
       lnussbaum@kaplanfox.com
       garenson@kaplanfox.com

H. Laddie Montague, Jr.
Eric L. Cramer
**BERGER & MONTAGUE, P.C.**
1622 Locust Street
Philadelphia, PA 19103
Telephone: (215) 875-3009
Fax: (215) 327-9583
E mail: hlmontague@bm.net
       ecramer@bm.net

Michael E. Criden
Kevin B. Love
**HANZMAN, CRIDEN & LOVE, P.A.**
7301 S.W. 57th Court, Suite 515
South Miami, FL 33143
Telephone: (305) 357-9010
Fax: (305) 357-9050
E mail: mcriden@hanzmancriden.com
       klove@hanzmancriden.com



RECEIVED
CLERK'S OFFICE

2007 SEP 10  P 12: 53

JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

## BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

|  |  |  |
|---|---|---|
| IN RE LTL TRUCKING ANTITRUST LITIGATION | : : : : : | MDL No. _____ |

### MEMORANDUM IN SUPPORT OF ISAAC INDUSTRIES, INC.'S MOTION TO TRANSFER AND FOR PRE-TRIAL COORDINATION OR CONSOLIDATION OF RELATED ACTIONS TO THE DISTRICT OF COLUMBIA PURSUANT TO 28 U.S.C. § 1407

Isaac Industries, Inc. ("Isaac Industries"), plaintiff in an action entitled Isaac Industries,

Inc. v. AAA Cooper Transportation, et al., Case No. ___07-01638___(D.D.C.), respectfully moves

this Panel for transfer and pre-trial coordination or consolidation of eleven presently pending

antitrust class actions pursuant to 28 U.S.C. § 1407. Each of these actions alleges violations of

federal antitrust law through a conspiracy to fix the prices of fuel surcharges applied in the less-

than-truckload ("LTL") freight shipping industry.  (A schedule of actions to be consolidated is

annexed as Appendix A).

Centralization is appropriate because these actions involve common issues of fact and

law, and are brought against a largely overlapping group of defendant LTL freight transportation

services providers. The District of Columbia is the ideal transfer forum because it possesses the

strongest nexus to this action, most notably through its proximity to several important non-party

witnesses, including the trade organizations under whose auspices the defendants are alleged to

have met and conspired. In addition, the District of Columbia is the most geographically

convenient forum, as a major transportation hub that is readily accessible by: (i) the majority of

defendants clustered in the eastern and southeastern United States; (ii) defendants' counsel,

many of whom are located in Washington D.C.; and (iii) plaintiffs' counsel, a majority of whom

are located in the Northeastern Corridor. For these reasons, Isaac Industries respectfully requests

transfer of the LTL freight shipping actions to the District of Columbia for centralized pre-trial

proceedings.

## I.   BACKGROUND

The freight trucking industry is divided between "truckload" carriers that are hired to

move larger shipments directly from origin to destination and "less-then-truckload" carriers that

consolidate smaller shipments for transportation to a terminal where they are divided again for

further transport towards their destination. There are less than 1,000 firms in the LTL

transportation market, with five groups of related firms, along with seven individual firms,

controlling approximately 76% of the LTL market.[1]

Isaac Industries represents a class of purchasers of LTL freight transportation services

who, from at least as early as June 15, 2003, purchased LTL freight transportation services and

---

[1] The five groups include: (1) the "YRC Group", which includes YRC Worldwide, Inc., Yellow Transportation, Inc., Roadway Express, Inc., and YRC Regional Transportation, Inc.; (2) the "FedEx Group", which includes FedEx Corporation, FedEx Freight Corporation, FedEx National LTL, Inc., and Watkins Motor Lines; (3) the "UPS Group," which includes United Parcel Service, Inc. and Overnite Corporation; (4) the "Arkansas Best Group," which includes Arkansas Best Corporation and ABF Freight Systems, Inc.; and (5) the "SAIA Group" which includes SAIA, Inc., Saia Motor Freight Line LLC, Jevic Transportation, Inc., and Sun Capital Partners IV, LLC.

The seven individual firms include: (1) Con-Way Freight, Inc.; (2) Estes Express Lines, Inc.; (3) Old Dominion Freight Line, Inc.; (4) Averitt Express, Inc.; (5) R+L Carriers, Inc.; (6) Southeastern Freight Lines, Inc.; and (7) AAA Cooper Transportation, Inc.

were assessed and paid a fuel surcharge to one of the dominant firms in the industry. It alleges that during this time, and possibly earlier, those firms conspired to fix, raise, maintain or stabilize the prices of LTL fuel surcharges.

As of the date of this motion, counsel for Isaac Industries is aware of eleven related class actions which are pending in various federal courts throughout the United States. Each of these actions arises out of a common core of factual allegations, specifically, that some or all of the dominant LTL freight shipping firms engaged in a conspiracy to fix, raise, maintain or stabilize the prices of the fuel surcharge applied to LTL freight shipping in violation of Section 1 of the Sherman Act, thereby overcharging direct purchasers of such services and depriving them of the benefits of a competitive marketplace.

## II.    ARGUMENT

### A. THE LESS-THAN-TRUCKLOAD FREIGHT SHIPPING CASES SHOULD BE COORDINATED

This Panel is authorized to transfer these actions for coordinated pretrial proceedings if three conditions are satisfied: (i) the cases share "one or more common questions of fact," (ii) transfer will further "the convenience of parties and witnesses," and (iii) transfer "will promote the just and efficient conduct of the actions." 28 U.S.C. § 1407. Each condition is satisfied here.

#### 1.  The Eleven Related Cases Involve Common Questions of Fact

The action to be transferred shares common questions of fact which can most efficiently be explored through coordinated pre-trial discovery and proceedings. These common questions include:

- Whether the defendants engaged in a combination or conspiracy to fix, raise, maintain or stabilize the prices of fuel surcharges applied to LTL freight shipping services in the United States;

- The dates of formation and the duration of this combination or conspiracy;

- The identities of the participants in the combination or conspiracy;

- The manner and means of the combination or conspiracy; and

- Whether the combination or conspiracy resulted in higher prices paid by direct purchasers of LTL freight shipping services.

While these cases do not present a complete identity of defendants or legal theories, it is well-established that "transfer under Section 1407 does not require a complete identity or even a majority of common factual or legal issues[.]" In re Tyson Foods, Inc. Fair Labor Standards Act Litig., MDL No. 1854, 2007 WL 2386422, at *1 (J.P.M.L. Aug. 17, 2007). Centralization on a single docket is favored because such an arrangement: (1) "allows discovery with respect to any non-common issues to proceed concurrently with discovery on common issues," and (2) "ensures that pretrial proceedings will be conducted in a streamlined manner leading to the just and expeditious resolution of all actions to the overall benefit of the parties and the judiciary." Tyson Foods, 2007 WL 2386522, at *1. Accord In re Vonage Marketing & Sales Pratices Litig., MDL No. 1862, 2007 WL 2386424, at *1 (J.P.M.L. Aug. 15, 2007).

### 2. Centralization Will Further the Convenience of the Parties and the Witnesses

Consolidation or coordination of the pre-trial proceedings of these cases will serve the convenience of parties and witnesses alike. Each plaintiff will likely seek documents and depositions from the same defendants and critical non-party witnesses. Because the actions overlap in their factual allegations, there is a strong danger of duplicative document requests and

4

redundant depositions. Centralization will minimize the expense and burden on all concerned, including the judiciary, by ensuring that documents are searched for and produced only once; that depositions are traveled to and taken only once; and that disputes are briefed, heard and resolved only once. Because of the large number of defendants involved, discovery here has the potential to be extensive, and streamlining is particularly needed. See, e.g., In re Air Disaster at Denver, Co., on Nov. 16, 1976, 486 F. Supp. 241, 243 (J.P.M.L. 1980) (centralization necessary where discovery likely to be complex and extensive).

### 3. Centralization Will Promote the Just And Efficient Conduct of These Actions

Consolidation or Coordination will promote the just and efficient conduct of each of these actions. All of the actions were filed within the last two months and a review of the dockets of each reveals that none appear to have advanced significantly ahead of the group. The early stage of the litigation, combined with the presence of overlapping fact issues and the danger of duplicative discovery, makes this an ideal case for centralization under Section 1407. See, e.g., Pharmacy Benefit Managers Antitrust Litig., 452 F. Supp.2d 1352, 1353 (J.P.M.L. 2006) (Centralization desirable "to avoid duplication of discovery, prevent inconsistent or repetitive pretrial rulings (especially on the issue of class certification), and conserve the resources of the parties, their counsel and the judiciary."); In re Amino Acid Lysine Antitrust Litig., 910 F. Supp. 696, 698 (J.P.M.L. 1995) (coordination is appropriate to "conserve the resources of the parties, their counsel and the judiciary").

Failure to consolidate will squander both money and time, as the same defendants and witnesses scramble to produce documents by different deadlines and responsive to differently worded requests. Plaintiffs will find themselves competing to schedule the same witnesses for depositions, necessarily leading to delays for some. Redundant depositions will nonetheless

require an incalculable loss of time and money for all concerned.  And inconsistent pretrial

rulings will be inevitable, as multiple judges weigh similar issues at the same time.

Where, as here, coordination will avoid duplicative discovery, needless delay, and

conflicting pretrial rulings, transfer for pretrial purposes is warranted and serves the interests of

both the parties and the courts.

## B. THE DISTRICT OF COLUMBIA IS THE MOST APPROPRIATE FORUM FOR THIS LITIGATION

Among the factors which this Panel considers in deciding between potential transferee

fora are:  (i) the location of parties, witnesses, and documents; (ii) the accessibility of the

proposed transferee district to parties and witnesses; (iii) the respective case-loads of the

proposed transferee district court; and (iv) whether an action or actions pending in one of the

proposed transferee districts is at relatively more advanced stage of pretrial proceedings.  These

factors favor transfer and consolidation to the District of Columbia.

### 1.  Key Witnesses and Documents Provide A Strong Nexus Between the District of Columbia and This Litigation.

The defendants in these actions are alleged to have regularly met under the auspices of

two trade organizations, the American Trucking Associations, Inc. ("ATA") and the National

Motor Freight Traffic Association, Inc. ("NMFTA").  The NMFTA is based in Alexandria,

Virginia.  Its members include many of the defendants in these actions: AAA Cooper; ABF

Freight Systems, Inc.; Averitt Express; Con-Way; Estes Express Lines; FedEx Freight; FedEx

national LTL; Old Dominion Freight Lines; Roadway Express, Inc.; UPS Freight; and Yellow

Transportation, Inc.[2]  NFTA hosts regular member meetings in Alexandria, and several of the

---

[2] See NMFTA, http://www.nmfta.org/PageLibrary/ListofParticipatingMembers/tabid/101/Default.aspx (last visited September 12, 2007).

complaints here allege that the defendants may have used the NMFTA meetings to collude on fuel surcharges.

Similarly, the ATA describes itself as "the national voice for the trucking industry before Capitol Hill, regulators, the courts and the media."[3] It is headquartered in Arlington, Virginia and has a "Capitol Hill" office located in Washington, D.C. The ATA shares officers with some of the defendants in these actions: its treasurer is the Vice President of United Parcel Service, Inc. and its Secretary is the Chairman, President and CEO of Yellow Roadway Corporation.[4] Plaintiffs allege that meetings hosted by the ATA may have also been used by the defendants to collude on fuel surcharges.

The Surface Transportation Board ("STB") is located in the District of Columbia.[5] LTL freight shippers, among others, have the authority to enter into agreements with other carriers to collectively establish rates based on industry average carrier cost. These "motor carrier bureau agreements" are subject to periodic approval by the STB. On May 4, 2007, the STP terminated its approval of all such agreements, finding them to be against the public interest. Since deregulation, many of the freight shipping companies set their rates individually, rather than through rate bureaus, and thus were not affected by the recent decision. Although it is those individually set rates that are at issue here, the STB, as the key regulator of freight rates, will be an important source of documents and witnesses.

Finally, several of the defendants, including Estes Express Lines and Overnite Corp., are headquartered in nearby Richmond, Virginia.

---

[3] See American Trucking Associations, http://www.truckline.com/aboutata/our+members (last visited September 12, 2007).
[4] See American Trucking Associations, http://www.truckline.com/aboutata/officers.apx (last visited September 12, 2007).
[5] See Surface Transportation Board, www.stb.dot.gov/stb/contact.html (last visited September 11, 2007).

Because no other forum has as strong of a nexus to the litigation, where witnesses, documents, and defendants, can all be found, the District of Columbia is the best forum for this litigation. See, e.g., In re McDonald's French Fries Litig., 444 F. Supp. 2d 1342, 1343 (J.P.M.L. 2006) (transferring actions to forum that was likely source of relevant documents and witness, and where defendant headquartered); In re Delphi Corp. Secs., Derivative & ERISA Litig., 403 F. Supp. 2d 1358, 1359 (J.P.M.L. 2005) (transferring action to forum with a significant nexus to litigation); In re Enron Corp. Secs. Derivative & ERISA Litig., 196 F. Supp. 2d 1375, 1376 (J.P.M.L. 2002) (transferring action to forum where many parties, witnesses and documents will be found).

### 2. The District of Columbia is the Most Convenient Forum for the Majority of Parties, Witnesses and Counsel

Where, as here, the pending actions are geographically dispersed, this Panel has attempted to identify the most convenient forum for the majority of litigants.[6]  For several reasons, that forum is the District of Columbia.

First, the defendants in this action are clustered in the east and southeast United States:

- Alabama: AAA Cooper Transportation, Inc.;

- Arkansas: Arkansas Best Corporation and ABF Freight Systems, Inc.;

- Florida: Watkins Motor Lines;

- Georgia: Saia, Inc. and United Parcel Services, Inc.;

- Kansas: YRC Worldwide, Inc., Yellow Transportation, Inc., Roadway Express, Inc., and YRC Regional Transportation, Inc;

---

[6] Of the eleven pending actions, four are pending in the Southern District of California.  However, the other seven are all located in the east and southeastern United States. These actions are pending in the District of Connecticut, the District of Columbia, the Middle District of Florida, the District of South Carolina, the Northern District of Ohio, the District of New Jersey, and the District of Maine.  Other than the California actions, no other case has been filed in the western United States.

- Michigan: Con-Way Freight, Inc.;

- New Jersey: Jevic Transportation, Inc.

- North Carolina: Old Dominion Freight Line, Inc.;

- Ohio: R+L Carriers, Inc.;

- South Carolina: Southeastern Freight Lines, Inc.;

- Elevennessee:  Averitt Express, Inc.; FedEx Corporation, FedEx Freight Corporation, and FedEx National LTL, Inc.; and

- Virginia: Estes Express Lines, Inc. and Overnite Corp.

For these defendants, the District of Columbia is the most centrally located of the potential fora.  As discussed in Section II.B.1, the District of Columbia is also an easy commute for several key non-party witnesses.  In addition, several District of Columbia law firms have already entered appearances on behalf of various defendants, and the majority of plaintiffs' counsel are located within the Northeastern Corridor, which has easy access to the District of Columbia via shuttle and train.  Because the District of Columbia is a major transportation hub which is easily accessible by air, rail and automobile, it is the best choice for the largest number of parties, witnesses, and counsel.  See, e.g., McDonald's French Fries, 444 F. Supp. 2d at 1343 (transferring action to forum deemed "relatively geographically central and accessible"); In re Publication Paper Antitrust Litig., 346 F. Supp. 2d 1370, 1372 (J.P.M.L. 2004) (transferring actions to "geographically convenient location, given the location of principal defendants and potential defendants and witnesses in the eastern part of the United States . . ."); In re Cardiac Devices Qui Tam Litig., 254 F. Supp. 2d 1370, 1373 (J.P.M.L. 2003) (transferring action to fora geographically convenient to the majority of litigants).

### 3. The District of Columbia has a Lighter Per-Judge Caseload than Either the Southern District of California or the District of North Carolina

Because efficiency is the lynchpin of Section 1407, the caseload of the poelevential fora should be considered in determining which district should be assigned a major new action. This consideration favors the District of Columbia. Of the three likely fora, the District of Columbia boasts the lightest caseload per judge. The District of Columbia has 274 pending cases per judge, versus 290 for the Southern District of California, and 371 for the District of South Carolina.

The heavy caseload of the District of South Carolina is a disadvantage compounded by the fact that Judge Houck, the proposed transferee judge, has just been assigned a sizable new MDL proceeding by this Panel.[7] Thus, the interests of judicial efficiency mitigates in favor of the District of Columbia.

### 4. All Actions Are At a Similar Stage In The Litigation

The earliest filed of the eleven related actions was filed less than two months ago. All of the cases are at a similar early stage of the litigation. A review of the various docket reveals that no defendant appears to have moved or answered with respect to any complaint, nor does it appear that discovery been conducted. Thus, this consideration does not favor any district over the District of Columbia.

---

[7] In re Household Goods Movers Antitrust Litig., MDL No. 1865 (D.S.C. transferred Aug. 16, 2007).

## C. SOUTH CAROLINA IS NOT THE MOST APPROPRIATE FORUM FOR THIS LITIGATION

In the brief supporting their motion to transfer, the Berle plaintiffs argue that the LTL freight shipping cases should be centralized under the Honorable C. Weston Houck of South Carolina. They base their motion on a single argument, specifically, that Judge Houck has recently been given responsibility for another MDL, In re Household Goods Movers Antitrust Litigation, MDL No. 1865 (D.S.C.), and therefore is "experienced in fuel surcharge litigation in the motor carrier industry." Berle Brief at 4.   This argument lacks merit, as other than superficial similarities -- both actions involve trucking services and allegations of collusive activity regarding fuel surcharges -- these litigations are too dissimilar for any efficiency gains to be added by concentrating both on the same docket.

A key issue in each of the motor carrier fuel surcharge cases will be the regulatory background of each industry. This background is complex, and differs greatly between the different types of carriers. As the Surface Transportation Board recently noted, "[t]he collective activity of household goods carriers . . . differs from that of motor freight carriers," and merits distinct treatment. See Surface Transportation Board Decision, STB Ex Parte No. 656 (Sub-No 1), "Investigation into the Practices of the National Classification Committee," at 19 (May 4, 2007) (Attached as Exhibit A).   Historically, the household goods carriers had their rates set by its own rate-setting bureau, known as The Household Goods Carriers' Bureau Committee. As the STB noted, "[o]ne significant difference between household goods carriage and freight carriage is that household goods carriers' rates remain subject to regulation[,]" whereas the LTL freight shippers have been deregulated. Id. at 19.   The issues presented by the Household Goods regulatory scheme are unique, and are central to the MDL pending before Judge Houck.

For example, the Household Goods Complaints allege that the defendants in that litigation violated the regulatory scheme by charging more for services than were specified in the tariffs published pursuant to those regulations. See Complaint in Beach v. Atlas Van Lines, Inc., et al., at 16 (Annexed as Exhibit B). As one Household Goods Complaint alleges: "defendants published one "Fuel Surcharge" in Tariff 400-N for the public and the STB, and colluded to charge a different "Fuel Surcharge" pursuant to [an illicit scheme.]" See Exhibit B at 16. These issues will shape the Household Goods litigation in a way that will have no analogy in the LTL freight shipper litigation, and may raise the specter of confusion if the litigations are handled in parallel, as the Berle plaintiffs seem to suggest.

In addition, the markets for the different motor carriers vary as widely from each other, as they do from the markets for railroad freight carriers or air freight carriers.   For example, the group of consumers affected by collusive activity in each industry differ markedly – the services of household goods carriers are purchased mainly by individual private households and not commercial entities.  Nor do any of the defendants overlap in the two sets of actions.  Thus, rather than serve as a boon to efficiency, supervision of two potentially large fuel surcharge litigations will serve only to swell Judge Houck's docket and lead to the danger of confusion of the complex regulatory and market distinctions between the two litigations.

### III. Conclusion

For the reasons stated above, Isaac Industries requests the LTL freight shipping actions be consolidated or coordinated, and transferred to the District of Columbia, and oppose transfer of the actions to any other proposed transferee forum.

Dated: September 18, 2007.

Respectfully submitted,

BOIES, SCHILLER & FLEXNER LLP

By: _____

Richard B. Drubel, Jr. (D.C. Bar No. 334359)
Tanya Chutkan (D.C. Bar No. 420478)
5301 Wisconsin Avenue, NW
Washington, DC 20015
Telephone: (202) 237-2727
Fax: (202) 237-6131
E mail: rdrubel@bsfllp.com
　　　　Tchutkan@bsfllp.com

KAPLAN, FOX & KILSHEIMER, LLP

Robert N. Kaplan
Linda P. Nussbaum (D.C. Bar No. 483254)
Gregory K. Arenson
850 Third Avenue, 14th Floor
New York, NY 10022
Telephone: (212) 687-1980
Fax: (212) 687-7714
E mail: rkaplan@kaplanfox.com
　　　　lnussbaum@kaplanfox.com
　　　　garenson@kaplanfox.com

H. Laddie Montague, Jr.
Eric L. Cramer
**BERGER & MONTAGUE, P.C.**
1622 Locust Street
Philadelphia, PA 19103
Telephone: (215) 875-3009
Fax: (215) 327-9583
E mail: hlmontague@bm.net
　　　　ecramer@bm.net

Michael E. Criden
Kevin B. Love
**HANZMAN, CRIDEN & LOVE, P.A.**
7301 S.W. 57th Court, Suite 515
South Miami, FL 33143
Telephone: (305) 357-9010
Fax: (305) 357-9050

13

E mail:  mcriden@hanzmancriden.com
klove@hanzmancriden.com

# Exhibit A

BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION
REVISED SCHEDULE OF ACTIONS

In Re LTL Trucking Antitrust
Litigation

MDL No. _____

**APPENDIX A**

REVISED SCHEDULE OF ACTIONS

| Caption | Civil Action No. | Venue | Date Filed | Judge |
|---|---|---|---|---|
| **Plaintiffs:** *Farm Water Technological Services, Inc., d/b/a Water Tech, C.B.J.T., Inc., d/b/a Agricultural Supply* <br><br> **Defendants:** *Arkansas Best Corporation; Averit Express, Inc. Con-Way Inc.; FedEx Corporation; Jevic Transportation, Inc.; New England Motor Freight, Inc.; R+L Carriers, Inc.; SAIA, Inc.; SUN Capital Partners IV LLC; United Parcel Service, Inc.; YRC Worldwide, Inc.* | 07-cv-01389 | S.D. Cal. | July 30, 2007 | Hon. Roger T. Benitez |
| **Plaintiffs:** *Global Wire, Inc.; Wyre Wynd Life Wire, Inc.; Montgomery Wire Corp.* | 3:07-cv-1192 | D. Conn. | August 6, 2007 | Hon. Janet C. Hall |

1

| | | | |
|---|---|---|---|
| **Defendants:** *Arkansas Best Corporation; Averitt Express, Inc. Con-Way Inc.; FedEx Corporation; Jevic Transportation, Inc.; Sun Capital Partners IV LLC; New England Motor Freight, Inc.; Old Dominion Freight Line, Inc.; R+L Carriers, Inc.; SAIA, Inc.; SAIA Motor Freight Line LLC; United Parcel Service, Inc.; YRC Worldwide, Inc.,* | | | |
| **Plaintiff:** *Inkjets.com of Florida, Inc.*<br><br>**Defendants:** *Arkansas Best Corporation; Averitt Express, Inc. Con-Way Inc.; FedEx Corporation; Jevic Transportation, Inc.; Sun Capital Partners IV LLC; New England Motor Freight, Inc.; Old Dominion Freight Line, Inc.; R+L Carriers, Inc.; SAIA, Inc.; SAIA Motor Freight Line LLC; United Parcel Service, Inc.; YRC Worldwide, Inc.* | 2:07-cv-00518 | M.D. Fla. | August 16, 2007 | Hon. John E. Steele |
| **Plaintiffs:** *Berle Manufacturing Company; Berle Enterprises, Inc.* | 2:07-cv-2923 | D.S.C. | August 23, 2007 | Hon. C. Weston Houck |

2

| | | | |
|---|---|---|---|
| **Defendants:** *Southern Motor Carriers Rate Conference, Inc.; AAA Cooper Transportation; Averitt Express, Inc.; Estes Express Lines, Inc.; FedEx National LTL, Inc.; Old Dominion Freight Line, Inc.; R&L Carriers, Inc.; Saia Motor Freight Line, L.L.C.; Southeastern Freight Lines, Inc.; UPS Freight; John Does I-X* | | | |
| **Plaintiff:** *Computer Management International*<br><br>**Defendants:** *Arkansas Best Corporation; ABF Freight Systems, Inc.; Averitt Express, Inc. Con-Way Inc.; Con-Way Freight Inc.; FedEx Corporation; FedEx Freight Corporation; Jevic Transportation, Inc.; New England Motor Freight, Inc.; Old Dominion Freight Line, Inc.; R+L Carriers, Inc.; SAIA, Inc.; SAIA Motor Freight Line LLC; United Parcel Service, Inc; YRC Worldwide, Inc.* | 1:07-cv-02640 | N.D. Oh. | August 30, 2007 | Hon. Roger T. Benitez |
| **Plaintiff:** *Niagara Frontier* | 07-cv-01728 | S.D. Cal. | August 31, 2007 | Hon. Thomas J. Whalen |

3

| | | | |
|---|---|---|---|
| *Distribution, Inc.*<br><br>**Defendants:** *Arkansas Best Corporation; ABF Freight Systems, Inc.; Averitt Express, Inc. Con-Way Inc.; Con-Way Freight Inc.; Estes Express Lines; FedEx Corporation; Old Dominion Freight Line, Inc.; SAIA, Inc.; SAIA Motor Freight Line LLC; United Parcel Service, Inc.; YRC Worldwide, Inc.* | | | |
| **Plaintiff:** *Tex-Tech Industries, Inc.*<br><br>**Defendants:** *Arkansas Best Corporation; Averitt Express, Inc. Con-Way Inc.; FedEx Corporation; Jevic Transportation, Inc.; Sun Capital Partners IV, LLC; New England Motor Freight, Inc.; Old Dominion Freight Line, Inc.; R+L Carriers, Inc.; SAIA, Inc.; United Parcel Service, Inc; YRC Worldwide, Inc.* | 2:07-cv-00157 | D. Me. | September 5, 2007 | Hon. D. Brock Hornby |
| **Plaintiff:** *Lawrence F. Thompson d/b/a Top Floor* | 1:07-cv-04271 | D. N.J. | September 6, 2007 | Hon. Jerome B. Simandle |

4

| | | | |
|---|---|---|---|
| *Home Improvements* **Defendants:** *Arkansas Best Corporation; Averitt Express, Inc. Con-Way Inc.; FedEx Corporation; Jevic Transportation, Inc.; New England Motor Freight, Inc.; Old Dominion Freight Line, Inc.; Sun Capital Partners IV, LLC; R+L Carriers, Inc.; SAIA, Inc.; United Parcel Service, Inc.; YRC Worldwide, Inc.* | | | |
| **Plaintiff:** *C & L Trading of Miami, Inc.* **Defendants:** *Arkansas Best Corporation; Averitt Express, Inc.; Con-Way Inc.; FedEx Corporation; Jevic Transportation, Inc.; New England Motor Freight, Inc.; Old Dominion Freight Line, Inc.; R+L Carriers, Inc.; SAIA, Inc.; United Parcel Service, Inc; YRC Worldwide, Inc.* | 3:07-cv-1764 | S.D. Cal. | September 7, 2007 | Hon. Thomas J. Whelan |
| **Plaintiff:** *Dad's Product Co.* **Defendants:** *Arkansas Best Corporation; ABF Freight* | 3:07-cv-1765 | S.D. Cal. | September 7, 2007 | Hon. Roger T. Benitez |

5

| | | | | |
|---|---|---|---|---|
| Systems, Inc.; Averitt Express, Inc.; Con-Way Inc.; Con-Way Freight, Inc.; Estes Express Lines; FedEx Corporation; Old Dominion Freight Line, Inc.; SAIA, Inc.; SAIA Motor Freight Line, LLC; United Parcel Service, Inc; YRC Worldwide, Inc. | | | | |
| **Plaintiff:** *Isaac Industries, Inc.*<br><br>**Defendants:** *AAA Cooper Transportation; Arkansas Best Corporation; ABF Freight Systems, Inc.; Averitt Express, Inc. Con-Way Freight, Inc.; FedEx Corporation; Jevic Transportation, Inc.; New England Motor Freight, Inc.; Sun Capital Partners IV, LLC; Old Dominion Freight Line, Inc.; R+L Carriers, Inc.; SAIA, Inc.; United Parcel Service, Inc.; YRC Worldwide, Inc., Estes Express Lines, Inc. Fed Ex Freight Corp, Fed Ex national LTL, Inc., Overnite, Corp., Roadway Express, Inc., SAIA Motor Freight Line, LLC, Southeastern Freight Lines, Inc., Watkins Motor Lines, Yellow* | 1:07-cv-01638 | D.D.C. | September 14, 2007 | Hon. Reggie B. Walton |

*Transportation, Inc., YRC*
*Regional Transportation, Inc.*

7

# Exhibit B

This decision will be printed in the bound volumes of the STB printed reports at a later date.

35262
EB

SERVICE DATE – MAY 7, 2007

SURFACE TRANSPORTATION BOARD

DECISION

STB Ex Parte No. 656

MOTOR CARRIER BUREAUS – PERIODIC REVIEW PROCEEDING

STB Ex Parte No. 656 (Sub-No. 1)

INVESTIGATION INTO THE PRACTICES
OF THE
NATIONAL CLASSIFICATION COMMITTEE

Section 5a Application No. 46 (Sub-No. 20)[1]

SOUTHERN MOTOR CARRIERS RATE CONFERENCE, INC.

Decided: May 4, 2007

---

[1] This decision also embraces EC-MAC Motor Carriers Service Association, Inc., STB Section 5a Application No. 118 (Sub-No. 2); Household Goods Carriers Bureau Committee – Agreement, STB Section 5a Application No. 1 (Sub-No. 10); Machinery Haulers Association, Inc. – Agreement, STB Section 5a Application No. 58 (Sub-No. 4); Middlewest Motor Freight Bureau, Inc. – Renewal of Agreement, STB Section 5a Application No. 34 (Sub-Nos. 8 and 10); Nationwide Bulk Trucking Association, Inc. – Agreement, STB Section 5a Application No. 63 (Sub-No. 4); Application of the National Bus Traffic Association, Inc., for Extended Approval of its Conformed Agreement; STB Section 5a Application No. 9 (Amendment No. 8); National Classification Committee – Agreement, STB Section 5a Application No. 61 (Sub-No. 6); Pacific Inland Tariff Bureau, Inc. – Renewal of Agreement, STB Section 5a Application No. 22 (Sub-Nos. 7 and 8); Rocky Mountain Tariff Bureau, Inc., STB Section 5a Application No. 60 (Sub-Nos. 10 and 11); Southern Motor Carriers Rate Conference, Inc., STB Section 5a Application No. 46 (Sub-No. 21); New England Motor Rate Bureau, Inc., STB Section 5a Application No. 25 Amendment No. 8); and Western Motor Tariff Bureau, Inc. – Agreement, Section 5a Application No. 70 (Sub-No. 12).

STB Ex Parte No. 656, et al.

The Surface Transportation Board terminates its approval of the
agreements of motor carrier bureaus to engage in rate-related
collective activities.

In this decision the Board completes its periodic review, pursuant to 49 U.S.C. 13703(c),
of agreements of motor carriers to engage in rate-related collective activities. After analyzing
comments received from other interested persons and the submissions of the motor carrier
bureaus seeking renewal of their agreements, and after reviewing the record from the prior
review cycle, we have decided to terminate our approval of the agreements of all remaining
motor carrier bureaus.[2] To provide sufficient time for parties to adjust to a new environment
without antitrust immunity for motor carrier bureau activities, this decision will become effective
in 120 days.

The termination of Board approval of the underlying agreements renders moot the
requests of the Southern Motor Carriers Rate Conference and others, in Section 5a Application
No. 46 (Sub-No. 20) et al., for approval to expand the geographic scope of their collective
activities from regional to nationwide. Consequently, this decision also dismisses those
applications.

## BACKGROUND

Under 49 U.S.C. 13703(a)(1), motor carriers have authority to enter into agreements with
other carriers to collectively establish rates, classifications, mileage guides, rules and rate
adjustments for general application based on industry average carrier costs. Motor carriers may
seek Board approval of such an agreement, 49 U.S.C. 13703(a)(2), and if they obtain that
approval, their activities under the agreement are immunized from the antitrust laws pursuant to
49 U.S.C. 13703(a)(6). However, at least every 5 years the Board must review its approvals of
motor carrier bureau agreements, and must change the conditions of, or terminate, its approval
when necessary to protect the public interest. 49 U.S.C. 13703(c).

There are currently 11 motor carrier bureaus with Board-approved agreements
conducting various activities. One of these bureaus, the National Classification Committee,
comprised of motor carrier members, establishes freight commodity classifications. The NCC
assigns to each commodity a numerical "rating" based on four transportation characteristics—

---

[2]  The 11 bureaus that have sought renewal of Board approval of their agreements are:
EC-MAC Motor Carriers Service Association, Inc.; Household Goods Carriers Bureau
Committee (HGCBC); Machinery Haulers Association, Inc.; Middlewest Motor Freight, Inc.;
Nationwide Bulk Trucking Association, Inc.; National Bus Traffic Association, Inc. (NBTA);
National Classification Committee (NCC); Pacific Inland Tariff Bureau, Inc.; Rocky Mountain
Tariff Bureau, Inc.; Southern Motor Carriers Rate Conference, Inc. (SMCRC); and Western
Motor Tariff Bureau, Inc.

STB Ex Parte No. 656, et al.

density, stowability, ease of handling, and liability for breakage or loss.[3] Motor carrier rate bureaus, acting independently of NCC, then develop collective rates (referred to as class rates) based on the classification ratings developed by NCC and other movement characteristics that they consider relevant, such as distance, shipment weight, and whether the shipment is truckload or less-than-truckload (LTL). Class rates tend to increase with the classification rating. In other words, all other things being equal, a shipment with a classification rating of 100 will have a lower final charge than a shipment with a classification rating of 200.

Prior to the reforms of the Motor Carrier Act of 1980 (1980 Act),[4] shippers were far more likely to be charged the class rates set by rate bureaus.[5] Now, many carriers, especially the larger ones, set their rates individually according to their own costs and market conditions, and they separately publish their own rates. Those carriers that do continue to use a class rate system usually apply significant discounts to the class rates due to competition among carriers. For those carriers and the shippers that use them, the class rates can serve as a baseline and a common language for further negotiations. The bureaus argue that the class-rate system reduces the need for shippers and carriers to retain large amounts of data that would otherwise be required to solicit and generate rate quotes.

Rate bureaus also compute general rate increases (GRI) for their members. GRIs are initiated, at least in part, to improve participating carriers' operating ratios by factoring in industry-wide increases in costs.

Other services provided by motor carrier bureaus include mileage guides and cost studies. In addition, SMCRC markets a service known as "Czar-Lite," which has been discussed extensively in this and prior proceedings. Czar-Lite is a nationwide database of the rates collectively set by all of the bureaus, and it is available on-line for a fee. It provides a commercial replacement for the information dissemination function of tariffs that previously were filed with the Board's predecessor, the Interstate Commerce Commission (ICC).

The collective rate-related activities of the NBTA and the HGCBC are tailored to the bus and household goods industries, respectively. They are described in greater detail infra.

---

[3] See Investigation into Motor Carrier Classification, 364 I.C.C. 906 (1981) and 367 I.C.C. 243 (1983), aff'd, National Classification Committee v. United States, 765 F.2d 1146 (D.C. Cir. 1985).

[4] Pub. L. No. 96-296, 94 Stat. 793 (1980).

[5] In 1976 there were only 9,261 notices of "independent action" by carriers in the bureau system. By 1981, there were more than 80,000 such notices. See Motor Carrier Ratemaking Study Commission, Collective Ratemaking in the Trucking Industry; A Report to the President and the Congress of the United States, at Ch. 4, Exh. 14 (1983) (Motor Carrier Ratemaking Study).

- 3 -

STB Ex Parte No. 656, et al.

    Prior Review Cycle. In the prior review cycle, the Board imposed more restrictive conditions on its renewed approval of most bureau agreements.[6] NCC was required to amend its agreement to provide for: (1) shipper access to critical information at an earlier stage in the classification process; (2) resolution of classification dockets by a single, expedited decision; and (3) the right to seek an initial review of that decision by a neutral arbitrator.[7] The rate bureaus were required to amend their agreements to: (1) furnish a "truth-in-rates notice" when collective rates are quoted, disclosing the range of discounts offered by member carriers; and (2) prohibit the use of a loss-of-discount penalty for late payment of charges.[8]

    Current Review Cycle. In December 2004, the Board commenced the current review of all outstanding motor carrier bureau agreements in STB Ex Parte No. 656.[9] Because a number of the comments received were directed solely to NCC, in October 2005, the Board commenced a separate investigation into NCC's activities in STB Ex Parte No. 656 (Sub-No. 1).[10]

    Expansion Requests. In 1994, SMCRC, which currently conducts collective ratemaking activities on a regional basis, sought approval to operate on a nationwide basis.[11] In response,

---

[6] Board approval of the NBTA agreement was renewed without conditions. Application of the National Bus Traffic Association, Inc., for Extended Approval of its Conformed Agreement, Section 5a Application No. 9 (Amendment No. 8) (STB served May 24, 2002). The Board did not rule at that time on the application for renewed approval of the HGCBC, which has continued to operate under its previously approved agreement.

[7] See National Classification Committee – Agreement, 3 S.T.B. 917 (1998), 4 S.T.B. 496 (2000), 5 S.T.B. 1077 (2001), and Section 5a Application No. 61 (Sub.-No. 6) (STB served Mar. 27, 2003, Oct. 16, 2003, and Dec. 10, 2003).

[8] See Rate Bureau Agreements – EC-MAC Motor Carriers Service Assoc., Inc., et al., 5 S.T.B. 1065 (2001); Section 5a Application No. 118 (Sub.-No. 2) (STB served Mar. 27, 2003 (EC-MAC-II), and Oct. 16, 2003); Niagara Frontier Tariff Bureau, Inc. – Agreement, STB Section 5a Application No. 45 (Amendment No. 17) (STB served Oct. 16, 2003); Middlewest Motor Freight Bureau, Inc. – Renewal of Agreement, STB Section 5a Application No. 34 (Sub-No. 10) (STB served Jan. 21, 2004); and Pacific Inland Tariff Bureau, Inc. – Renewal of Agreement, STB Section 5a Application No. 22 (Sub-No. 8) (STB served Jan. 15, 2004).

[9] See Motor Carrier Bureau – Periodic Review Proceeding, STB Ex Parte No. 656 (STB served Dec. 1, 2004), revised (STB served Jan. 21, 2005).

[10] See 70 FR 60881 (Oct. 19, 2005).

[11] SMCRC's original application for expansion was docketed as Section 5a Application No. 46 (Amendment No. 19). In 1996, SMCRC submitted a revised application, which was docketed as Section 5a Application No. 46 (Sub-No. 20). A proposal for minor changes to its agreement that was unrelated to the proposed expansion was separately considered and approved in Southern Motor Carriers Rate Conference, Inc., Section 5a Application No. 46 (Amendment No. 20) (STB served Sept. 4, 1997).

- 4 -

STB Ex Parte No. 656, et al.

six other regional rate bureaus sought approval to operate nationwide in the event that SMCRC received such approval. All of the territorial expansion requests were subsequently consolidated and merged into a broader proceeding to determine whether continued approval of existing agreements was warranted.[12] In EC-MAC Motor Carriers Service Assoc., Inc., et al., 3 S.T.B. 926, 935 (1998) (EC-MAC-I), the Board delayed consideration of the matter, at the request of certain members of Congress, in anticipation of further Congressional action regarding motor carrier bureaus.

In December 1999, Congress amended the statute to prohibit the Board from approving geographic expansion of regional rate bureaus to operate nationwide.[13] In February 2003, Congress removed that prohibition.[14] Accordingly, in November 2003, SMCRC renewed its request for approval to conduct collective ratemaking nationwide. The Board reopened the record and sought comments on the renewed request.[15]

A summary of all of the filings received in this case is provided in the Appendix.

### DISCUSSION AND CONCLUSIONS

Our action today represents the final step in a process that began more than a quarter century ago of making the motor carrier industry fully competitive. The 11 remaining rate bureaus constitute the vestige of a system of collective ratemaking developed during a period of extensive regulatory intervention in the transportation marketplace. Given the maturity and vitality of the motor carrier industry, that system is incompatible with a free market-based and fully competitive system.

Both collective ratemaking and the debate about whether such activity should be shielded from the antitrust laws have been a part of the motor carrier industry since its inception. The difficulties of the Great Depression had a profound effect on the ability of all American industries to earn compensatory revenues. As part of President Franklin Roosevelt's New Deal, Congress passed the National Industrial Recovery Act[16] (NIRA), which replaced free market competition with cooperative action subject to regulatory oversight. NIRA was intended to

---

[12] See 59 FR 25121 (May 13, 1994) (consolidating the requests and seeking comments); and 62 FR 27653 (May 20, 1997) (broadening the territorial expansion proceedings and seeking additional comments on all relevant issues, including fundamental questions about the role of the rate bureaus and the need for antitrust immunity in the current environment).

[13] See former 49 U.S.C. 13703(d) (2000).

[14] See section 354 of the Omnibus Appropriations Act FY 2003, Pub. L. No. 108-7, 117 Stat. 11 (Feb. 20, 2003); H.R. Conf. Rep. No. 108-10 (2003).

[15] 69 FR 13620 (Mar. 23, 2004).

[16] Ch. 90, 48 Stat. 195 (1933).

- 5 -

STB Ex Parte No. 656, et al.

stimulate the economy through the promotion of "codes of fair competition" and the
standardization of certain business practices. The code governing the motor carrier industry,
developed by the new motor carrier rate bureaus, required that each carrier file a schedule of
minimum rates and tariffs.[17]

After NIRA was struck down by the Supreme Court, Congress passed the Motor Carrier
Act of 1935[18] (the 1935 Act), which initiated a system under which the ICC restricted new entry
into the trucking business and approved specific routes. The 1935 Act also required motor
carriers to file tariffs with the ICC 30 days in advance, allowed protest from other common
carriers of a proposed tariff, and required that carriers' rates be reasonable "as to both minimum
and maximum."[19] The underlying rationale of the 1935 Act was that the motor carrier sector was
economically unstable and that cut-throat competition might destroy the fledgling industry.

In 1948, with the motor carrier industry facing antitrust lawsuits and investigations by the
U.S. Department of Justice and several states regarding collective activity, Congress passed the
Reed-Bullwinkle Act (Pub. L. No. 80-662, 62 Stat. 472 (1948)). That act allowed rate bureaus
operating under ICC-approved agreements to set rates collectively, and it immunized the
activities of bureaus operating under an ICC-approved agreement from the antitrust laws.

In the environment of pervasive regulation, almost all carriers belonged to a rate bureau.
Most customers paid the undiscounted class rates that the bureaus set and published for their
member carriers. The bureaus also published adjustments to those rates (whether reductions or
increases) that any member carrier might request. The bureaus calculated and published, for
their member carriers, the amounts of any across-the-board increases or decreases to rates that
should be applied to take into account changes in the carriers' labor and fuel costs. All rates
were subject to regulatory challenge.

The regulatory environment has changed substantially since the bureaus began. As the
Interstate Highway System was built and trucks, rather than the railroads, came to dominate the
carriage of manufactured goods, the motor carrier industry achieved financial stability and the
original rationale for restrictive motor carrier regulation ceased to exist. A significant turning
point was the 1980 Motor Carrier Act, in which Congress essentially repealed interstate motor
carrier regulation in order to promote competition.[20] The 1980 Act curtailed the permissible

---

[17] See Motor Carrier Ratemaking Study at 455, 534.

[18] Ch. 498, 49 Stat. 543 (1935).

[19] See Franklin D. Roosevelt, Statement on Signing the Motor Carrier Act, Aug. 9, 1935
at http://www.presidency.ucsb.edu/ws/index.php?pid=14912.

[20] See H.R. Rep No. 96-1069, at 3 (1980) ("Th[is] legislation establishes a new Federal
policy which is to promote a competitive and efficient motor carrier industry . . . ."); Central &
Southern Motor Freight Tariff Ass'n v. United States, 757 F.2d 301, 309-12 (D.C. Cir. 1985).

STB Ex Parte No. 656, et al.

activities of rate bureaus seeking continued regulatory approval.[21]  Then, in 1994, Congress removed the requirement that motor carriers of general freight file tariffs.[22]

In the ICC Termination Act of 1995 (ICCTA),[23] Congress removed most of the remaining framework of pervasive regulation in favor of more robust competition.  It eliminated regulation of motor carrier rates altogether, except for rates for household goods movements, rates for joint motor-water movements in noncontiguous domestic trade,[24] and rates set collectively by motor carrier bureaus.[25]  Congress also mandated a periodic review of existing motor carrier bureau agreements under a "public interest" standard, presumably in recognition of the prospect that the deregulated environment could render government approval of motor carrier collective activities and continued antitrust immunity inappropriate.

Four years later, Congress rejected a proposed amendment that would have "made the STB's review discretionary rather than mandatory and return[ed] the process for reviewing these [agreements] to what it was prior to [ICCTA]."[26]  Instead, Congress retained a mandatory periodic review of all agreements, requiring the Board to take a fresh look "every five years [at] any agreement for any activities approved under Section 13703."[27]

-----

[21]  Among other things, the Act prohibited bureaus and their members from interfering with any carrier's right to publish its own rates and prohibited bureau members from voting on rate proposals in which they did not participate, other than general rate increases, changes in commodity classifications, and changes in tariff structure.  See former 49 U.S.C. 10706(b)(3).  Congress also provided for an independent study of motor carrier ratemaking to review what role, if any, the rate bureaus should continue to have.  The group assigned to conduct the study recommended the "complete elimination" of antitrust immunity for motor carrier ratemaking, finding that it restrains competitive behavior.  See Motor Carrier Ratemaking Study at summary p. xv and p. 534.  To date, that recommendation has not been carried out.

[22]  Trucking Industry Regulatory Reform Act, Pub. L. No. 103-311, 108 Stat. 1673 (1994).

[23]  Pub. L. No. 104-88, 109 Stat. 803 (1995).

[24]  The term "noncontiguous domestic trade" refers to domestic (as opposed to international) movements originating in or destined to Alaska, Hawaii, or a territory or possession of the United States.  See 49 U.S.C. 13102(5).

[25]  See 49 U.S.C. 13701.

[26]  145 Cong. Rec. H10060-01 (Oct. 14, 1999); 49 U.S.C. 13101(b).

[27]  145 Cong. Rec. H12874 (Nov. 18, 1999).  Board approval of an agreement does not expire on its own.  Rather, existing agreements "shall continue unless the Board determines otherwise."  49 U.S.C. 13703(c)(2).

STB Ex Parte No. 656, et al.

Since extensive regulation ended, the motor carrier industry has continued to increase its share of the nation's total freight expenditures.[28] The extensive regulation of the past served to protect the motor carrier industry from, among other things, what was perceived to be the threat of destructive intramodal competition. Based on this record, there is no longer any need for the controlled conditions under which the industry developed. Such conditions stifle competition.

### The Public Interest Standard.

Congress has directed us to approve motor carrier collective agreements only if we find that such agreements are in the public interest, and to terminate our approval of existing agreements when "necessary to protect the public interest."[29] Our determination of what actions are necessary to protect the public interest with respect to existing agreements is governed by the transportation policy set forth in 49 U.S.C. 13101(a).[30] These regulatory policy goals are replete with the Congressional desire for fair competition, reasonable rates, pricing flexibility and efficiency.

By mandating a periodic review of all agreements every 5 years, we believe Congress has directed us not only to review new developments that could affect our reasoning in prior decisions, but also to take a fresh look at the evidence and past reasons for finding any existing agreement to be in the public interest.[31] In the past, when the Board (and the ICC before it) has considered whether to approve certain collective agreements, it has evaluated: (1) whether the agreement furthers (or hinders) national transportation goals, (2) whether the agreement has anticompetitive effects, and if so, (3) whether the public benefits to the agreement outweigh any anticompetitive effects.[32] We believe that this approach is also an appropriate way to assess whether termination of approval is necessary to protect the public interest.

The transportation policy that guides this agency's actions regarding motor carriers is set out at 49 U.S.C. 13101. Specifically, as pertinent here, section 13101(a)(2) provides that it is the

---

[28] In 1980, approximately 70% of the nation's total freight expenditures were paid to motor carriers, compared with 87% in 2004. Motor Carrier Ratemaking Study at 42; Assessing the Motor Carrier Industry and Its Segments: Current and Prospective Issues, 2006 at 1, Prepared for Analysis Division, Office of Research and Analysis, Federal Motor Carrier Safety Administration (Apr. 1, 2006).

[29] 49 U.S.C. 13703(c)(1).

[30] See 145 Cong. Rec. H10060-01 (Oct. 14, 1999); 49 U.S.C. 13101(b).

[31] Congress's decision to have Board members appointed to 5-year terms means that each periodic review will likely be presided over by a Board with a different composition than in the prior review.

[32] See, e.g., Western Railroads Agreement, 364 I.C.C. 1 (1980); Household Goods Forwarders Tariff Bureau, Section 5a Application No. 106 (ICC served Aug. 7, 1991).

- 8 -

STB Ex Parte No. 656, et al.

policy of the United States Government, in overseeing transportation by motor carrier, to promote competitive and efficient transportation services in order to—

>    (A) encourage fair competition, with reasonable rates for transportation by motor carriers of property,

>    (B) provide efficiency in the motor carrier transportation system. . .

>    (D) allow a variety of quality and price options to meet changing market demands and the diverse requirements of the shipping and traveling public. . .

>    (I) improve and maintain a sound, safe and competitive privately owned motor carrier system. . . .

The motor carrier transportation policy thus supports the promotion of competition in the motor carrier industry.

The 11 agreements immunize the participants from the application of the antitrust laws, in particular, as most relevant here, the Sherman Act. The fundamental purpose of the Sherman Act is to promote fair competition for the benefit of consumers and the economy. Section 1 of the Sherman Act prohibits agreements that unreasonably restrain trade.[33] Courts have construed section 1 as an absolute bar to certain types of agreements that "always or almost always tend to restrict competition and decrease output."[34] This includes agreements between competitors to fix prices, regardless of the "reasonableness" of the fixed price or the justifications for the arrangement.[35] Courts have condemned such horizontal pricing agreements[36] as per se unlawful even when the agreements relate only to maximum or "list" prices that are routinely discounted in the marketplace.[37]

---

[33] 15 U.S.C. 1. While section 1 literally prohibits all agreements in restraint of trade, the Supreme Court long ago construed the statute to prohibit only unreasonable restraints of trade. See Standard Oil Co. v. United States, 221 U.S. 1, 58 (1911).

[34] Broadcast Music, Inc. v. CBS, 441 U.S. 1, 19-20 (1979) (BMI).

[35] See United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 223 (1940).

[36] Horizontal price-fixing refers to an agreement between direct competitors at the same level of a market. In contrast, vertical price-fixing refers to agreements between parties at different levels in a market, e.g., an agreement between a product manufacturer and a retail dealer.

[37] See, e.g., In re High Fructose Corn Syrup Antitrust Litigation, 295 F.3d 651, 656 (7th Cir. 2002) (High Fructose) ("An agreement to fix list prices is . . . a per se violation of the Sherman Act even if most or for that matter all transactions occur at lower prices. . . , [S]ellers
(continued...)

STB Ex Parte No. 656, <u>et al.</u>

Antitrust immunity can be an integral part of a system of economic regulation that limits entry and protects existing carriers, while the application of the antitrust laws is consistent with a deregulated system of free market competition. Although the trucking industry was deregulated in 1980, this agency has permitted the industry to retain its antitrust immunity, subject to increasingly stringent restrictions, for more than a quarter century since that date. The remnants of the once pervasive system of collective ratemaking based on antitrust immunity represented by these 11 agreements have become increasingly anomalous with each passing year. The time has come to bring the legal environment in which the motor carrier industry operates into conformity with the economic realities that govern its behavior.

We conclude that termination of Board approval of all outstanding motor carrier bureau agreements has now become necessary and appropriate to protect the public interest. The public has a significant interest in having the competitive market set the rates for all shippers, without the restraint on competition that collectively set, antitrust-immunized class rates can produce. Our action today will protect all shippers, especially the small-volume or infrequent shippers who are most likely to lack the bargaining power to obtain market-driven discounts from the collectively set class rates.[38] We are confident that our approval of bureau agreements can be terminated without creating unfair or destructive competitive practices,[39] and without significant adverse effect on the efficiency or profitability of motor carrier operations,[40] or other policies favored under section 13101(a).

By terminating our approval of the motor carrier agreements, we fulfill our responsibility to "encourage fair competition, and reasonable rates by motor carriers,"[41] and usher the motor carrier industry into a fully competitive era. Prior Board and ICC approval of motor carrier bureau agreements may have been appropriate under the facts and circumstances of the past. However, continued reliance on the collectively set class rate system to "simplify" rate quoting is no longer worth the inevitable resulting reduction in competition. Advances in technology, the Internet and other communication tools make it easier for carriers and shippers to exchange the information necessary to solicit and generate rate quotes in a timely matter. Thus, based on our statutory mandate to protect the public interest, the record before us, and current market

―――――――――――――

(...continued)
would not bother to fix list prices if they thought that there would be no effect on transaction prices.").

[38] <u>See</u> 49 U.S.C. 13101(a)(1)(D) and (a)(2)(A) (transportation policy favoring reasonable rates for shippers).

[39] <u>See</u> 49 U.S.C. 13101(a)(1)(D) and (a)(2)(A).

[40] <u>See</u> 49 U.S.C. 13101(a)(1)(B), (a)(2)(B), and (a)(2)(E). <u>See also</u> 49 U.S.C. 13101(a)(1)(C) and (2)(F) and (I).

[41] <u>See</u> 49 U.S.C. 13101(a)(2)(A).

- 10 -

STB Ex Parte No. 656, et al.

conditions, we have looked anew at the benefits, costs, and appropriateness of collective ratemaking and attendant antitrust immunity.

We recognize that termination of approval of bureau agreements is a significant step beyond this agency's past approach of conditioning its approval on measures designed to reduce the potential for abuse, such as the procedural reforms imposed on NCC and the truth-in-rates requirement imposed on rate-setting bureaus. The bureaus argue that circumstances have not changed dramatically since the prior review cycle so as to justify a departure from that prior practice. However, the Board has both the authority and responsibility to take a fresh look at the evidence and arguments received here and in prior proceedings and to reconsider the sufficiency and effectiveness of its past approaches in light of current market conditions.[42] Indeed, in conducting a congressionally mandated periodic review, an agency has a duty to examine issues critically in each periodic review and should not simply rest on prior findings.[43]

Having completed the most recent periodic review, including comments and oral argument, we conclude that the reforms imposed in the past do not ensure that the competitive marketplace will determine the actual rates charged to shippers. Rather, we are now persuaded that the motor carrier collective ratemaking system is obsolete in this deregulated robust competitive market and that motor carrier bureaus should no longer be immunized from the antitrust laws. Our termination of approval of bureau agreements should not adversely affect any beneficial bureau activities that may promote the flow of commerce without harming competition – it will merely subject the bureaus to the same antitrust rules that govern the vast majority of industries in the private sector of our economy.

Our decision terminating approval of the bureau agreements does not prohibit carriers from entering into agreements with each other to engage in collective activities related to ratemaking, classification or any of the other subjects enumerated in section 13703(a)(1)(A)-(G). Section 13703(a) expressly provides carriers with "authority to enter" into such agreements, and does not require that agreements be submitted to the Board. The statute also explicitly states that termination of Board approval of a bureau agreement "has effect only as related to the application of the antitrust laws." 49 U.S.C. 13703 (c)(1). Thus, the basic question before us today is whether termination of antitrust immunity for bureau agreements is necessary to protect the public interest.[44] We find that it is.

---

[42] See Household Goods Forwarders Tariff Bureau v. ICC, 968 F.2d 81, 84 (D.C. Cir. 1992) ("An agency may change its position as long as it provides a reasoned basis for its decision.").

[43] See Fox Television Stations, Inc. v. FCC, 280 F.3d 1027, 1043 (D.C. Cir. 2002).

[44] We disagree with the assertion that issues of the benefits and costs of antitrust immunity in the context of motor carrier rate bureaus are not properly before us in this

(continued...)

- 11 -

STB Ex Parte No. 656, et al.

With that explanation of our general views on the issues, we now turn to a more specific examination and discussion of each of the various activities of motor carrier bureaus.

Collective Ratemaking

Overview.

At this point, continuation of rate-related collective activities by motor carrier bureaus free from exposure to the antitrust laws would have little, if any, public interest benefit. It is not necessary to further any remaining motor carrier regulation, which consists mainly of safety regulation by the Federal Motor Carrier Safety Administration (FMCSA). Nor is it necessary to allow motor carriers to interline, to set their own rates, to standardize packaging, or to cooperate in other ways for the sake of efficient operation.

Nearly all other industries price their goods and services in an environment that is fully subject to the antitrust laws. There is no longer any compelling reason why the antitrust laws should not apply equally to the motor carrier industry, where competition, and not regulation, governs rates and entry.[45] Continued antitrust immunity for collective rate-related activities can only hinder the full operation of the competitive forces unleashed by deregulation – forces that should induce firms to operate more efficiently and pass savings on to customers.

The Board's most recent approach of conditioning continued approval of the system of setting class rates upon adherence to a "truth-in-rates" notice, and a prohibition of loss-of-discount penalties for late payments does not go far enough to protect the public interest. Despite the bureaus' apparent adherence to the conditions, shippers' core concern – that collective ratemaking, even when subject to discounting, can lead to higher prices – remains. Because motor carriers no longer need protection from the antitrust laws, to preserve the status quo would deprive shippers of the full benefits of competition and therefore be contrary to the public interest.

Views of Other Federal Observers.

Our assessment of the adverse effects of the current immunized system is shared by the Department of Justice (DOJ) and Department of Transportation (DOT), both of which have participated in these proceedings. Both of those agencies are convinced that collective ratemaking likely leads to prices above competitive levels (the levels that would prevail if prices

---

(...continued)

proceeding. See, e.g., SMCRC Reply Comments, filed Apr. 1, 2005, in STB Ex Parte No. 656, at III.A p. 1.

[45] A different conclusion might be reached in an industry still subject to pervasive regulation. It is a widely held view that the more deregulated an industry becomes, the greater the role the antitrust laws should play.

- 12 -

were only set individually, according to competitive market forces). As DOJ points out, rate bureaus provide motor carriers with an otherwise-unavailable forum in which they can meet with their competitors, exchange cost information, discuss preferences on prices, resolve differences among firms, and agree to raise rates across the board through a general rate increase. According to DOJ, such communications inevitably lessen price competition among carriers and may also reduce competition on non-price terms of service. Further, by serving as a focal point for pricing decisions, use of a collectively set general rate increase (GRI) promotes a higher market price than would otherwise result. DOJ explains that the mere existence of a collectively determined GRI gives each trucking firm greater reason to expect that its rivals will take rate actions that are in line with the bureau-set GRI. Thus, a motor carrier may increase its rates in anticipation that other motor carriers will act likewise.

DOT agrees that granting collective ratemaking immunity from antitrust laws deprives the shipping public of the full benefit of the competitive market forces enjoyed by shippers using other modes of transportation. It argues that trucking does not present a unique situation warranting such special status. DOT further argues that the previously imposed consumer protection measures, such as the truth-in-rates notice and the unavailability of the loss-of-discount penalty for late payments, have not been effective in assuring competitive rates, as indicated by the shipper opposition to renewed approval of rate bureau agreements.[46]

At least one federal court of appeals has also expressed public interest concerns about motor carriers' ability to set rates collectively with antitrust immunity. In Central & S. Motor Freight Tariff Ass'n v. United States, 777 F.2d 722, 730 (D.C. Cir. 1985), the court reasoned that, "even if one adopts a benign view of rate bureau activities and assumes that the bureaus do not use their mantle of antitrust immunity to establish monopolistic prices, the ability to set rates collectively nonetheless permits association members to earn larger, or at least more stable, profits than they could in the absence of joint rate-setting." Thus, while "participation in rate bureaus immune from the antitrust laws . . . produces benefits for the carriers [, it is] fraught with danger for the public." Id. at 733.

Role of Discounting and General Rate Increases.

The bureaus argue that the pervasive discounting off of the class rates shows that collective ratemaking does not adversely affect competition and the level of rates. In 1991, the ICC accepted this argument and concluded that the activities of rate bureaus were therefore essentially benign.[47] The ICC recognized that the level of discounts varied significantly between

---

[46] Shipper organizations do not view the existing protections as sufficient. See Opening Comments of the National Small Shipments Traffic Conference, Inc., and the National Industrial Transportation League (NASSTRAC/NITL), filed Mar. 2, 2005, in STB Ex Parte No. 656, at 9.

[47] Investigation of Motor Carrier Bureau Practices, 7 I.C.C.2d 388, 463 (1991) (Investigation).

STB Ex Parte No. 656, et al.

shippers but speculated that the full class rates were most likely paid by shippers who might be able to protect themselves by more careful rate shopping.[48]

But, as the Board has recognized, the ICC did not give enough attention to the interests of those "disadvantaged shippers" who receive lesser or no discounts[49] not because they have failed to shop for discounts, but because they lack bargaining power.[50] They are likely to be low-volume shippers, shippers outside of major traffic lanes, or shippers in emergency situations. While withdrawal of antitrust immunity will not, by itself, increase any shipper's bargaining power (i.e., a small shipper will still be a small shipper), it will at least deter carriers from augmenting their own bargaining power by acting collectively. Presumably, a carrier would not continue to pay for membership in a rate bureau if its participation did not yield it additional revenues. Thus, it would appear either that enough disadvantaged shippers are charged bureau-set rates to make collective ratemaking financially worthwhile for carriers, or that an artificially high but industry-accepted collectively set starting point can lead to higher rates even after discounting.[51]

SMCRC witness Middleton confirmed that casual or infrequent shippers receive lesser discounts, but he attributed this to less attractive shipment density and freight characteristics.[52] One problem with this explanation is that the effect of varying shipment density and other freight characteristics already should be reflected in either the classification system (density, stowability, etc.) or the class rates (weight, distance, truckload or less-than-truckload), if the system is working properly.[53] Thus, if a shipment takes up an unusual amount of trailer space in relation to its weight, has stowability problems, or cannot spread its platform handling costs over a long distance, the base (undiscounted) rate should reflect these characteristics. In any event,

---

[48] Id.

[49] EC-MAC-I, 3 S.T.B. at 931.

[50] See HCPDC/NASSTRAC Comments filed Aug. 18, 1997, in EC-MAC-I, at 8-9; NASSTRAC/NITL Opening Comments, filed Mar. 2, 2005, in STB Ex Parte No. 656, at 6-7.

[51] As one court has observed: "Many sellers are blessed with customers who are 'sleepers,' that is, customers who don't shop around for the best buy; and even for those who do bargain for a lower price, the list price is usually the starting point for the bargaining and the higher it is (within reason) the higher the ultimately bargained price is likely to be." High Fructose, 295 F.3d at 656.

[52] Statement filed in Section 5a Application No. 46 (Sub-No. 20), on April 21, 2004, by Jack E. Middleton, Attachment 3, at 7. Witness Middleton's assertion that all shippers receive an automatic discount of at least 20% even if they do not negotiate means simply that the true collectively set rate is actually 80% of the nominal class rate.

[53] See EC-MAC-I, 4 S.T.B. at 508 n.11.

- 14 -

STB Ex Parte No. 656, et al.

even without antitrust immunity, carriers can set their rates to reflect the cost differentials described by witness Middleton, but they would have to do so on an individualized basis.

In its 1991 decision, the ICC further reasoned that the needs of disadvantaged shippers did not warrant special attention because there was enough capacity in the trucking market to enable even small or occasional shippers to find carriers to serve them at competitive rates.[54] However, the ICC's reasoning assumed a perfect flow of information to match the needs of disadvantaged shippers to carriers with available capacity, which is not necessarily the case.

In assessing the public interest, we must give significant consideration to the interests of disadvantaged shippers – the parties least able to self-protect and therefore most likely to have artificially high rates set by collective action. Termination of Board approval is the best way to protect their interests. As the Board has explained, "[o]ne feature of more competitive markets is that the benefits of low prices are broadly spread among the entire market of consumers, regardless of the fact that submarkets of consumers would, in the absence of competition, be willing to pay more for a good or service rather than do without it."[55]

Finally, it is noteworthy that the bureaus continued to implement GRIs on a regular basis, even in the face of extensive discounting off of the collectively set class rates. The record shows that, at least during the 1990s, collectively set rates, as increased by GRIs, increased substantially more than either the general rate of inflation (as measured by the Producers Price Index, or PPI) or the transportation rate of inflation (as measured by the Transportation Index, another Bureau of Labor Statistics series).[56] Thus, even those shippers who receive larger discounts may be subjected to rate increases, through the application of collectively set GRIs, that are larger and more frequent than they would be without collective action through rate bureaus. In short, at every shipper level, the class rate system can lead to higher rates than might otherwise be charged.

Any shipper can challenge a collectively set rate—whether a class rate or a GRI—before the Board. But given the range and scope of shippers' exposure to the artificially inflated rates

---

[54] Investigation, 7 I.C.C.2d at 463.

[55] EC-MAC-II, 3 S.T.B. at 932 [footnote omitted].

[56] On average, the Transportation Index increased 40%, while class rates increased 100%. See Comments of Health & Personal Care Distribution Conference, Inc., and National Small Shipments Traffic Conference, Inc. (HPCDC/NASSTRAC), filed in EC-MAC-I proceeding Aug. 18, 1997, at 8 and Appendix A. A bureau witness argued that collective rates increased by a lesser amount, based on the LTL Trucking component of the PPI. See Reply Comments of EC-MAC Motor Carriers Service Association, Inc., filed in EC-MAC-I proceeding Oct. 17, 1997, Statement of Irwin H. Silberman. But this component of the PPI measures changes in the actual less-than-truckload rates charged (including discounts), not changes in bureau-set rates.

- 15 -

that result from collective ratemaking, we are not convinced that this is an adequate or practical remedy. Rather, the large numbers of shipments affected by the rate bureaus' pricing practices, combined with the relatively modest per-shipment cost (compared to bulk shipments by rail, for example), as well as the time commitment required to pursue a regulatory challenge, argues for a more comprehensive approach. Reliance on mitigating the harms of collective rate-setting through increased regulation would not be sound policy when a more direct approach – termination of bureau approval – is readily available and better promotes market-based incentives and solutions.

Common Rate Format.

The bureaus argue that the present system of collectively set class rates is in the public interest and actually promotes competition by allowing shippers to compare rates in a common format. According to the bureaus, it is easier for shippers to compare the discounts offered off benchmark rates than it would be to compare individual, lengthy rate tariffs of each carrier they may consider using.

The shipper organizations that have participated in these proceedings do not see a need for a class rate system, however. They seek an end to collective rate-setting altogether. They believe they have no more need for a collectively set class-rate system than for the discontinued system of filed tariffs.

We too fail to see how use of a class rate as a baseline simplifies the process for shippers. Whether carriers use a common baseline or their own individual rate schedules, a shipper seeking competitive rate quotations must approach each carrier individually, providing the same information about the specifics of the particular movement (weight, distance, time, etc.), and ask for a market rate quote. To obtain competitive rate quotations that are truly useful, a shipper needs to know the final rates and charges for the specific movement, not simply percentage discounts taken from bureau tariffs (which may themselves differ where regions overlap). Under the discount-quotation system defended by the bureaus, if a carrier responds by quoting only a discount percentage and not the resulting rate, the shipper will have to consult the appropriate baseline tariff and "do the math" required to apply the quoted percentage to determine the rate. In short, shippers do not need a rate quotation to be expressed as a percentage off of a benchmark rate in order to understand it and may find it more useful to obtain competitive rate quotations in dollar terms.

Change of Approach.

In the prior review cycle, the Board recognized the adverse effect of collective ratemaking on the policy of section 13101(a) favoring competition and reasonable rates. But the Board stopped short of terminating approval of motor carrier bureau agreements at that time. Rather, in EC-MAC-1, 3 S.T.B. 926 (1998), the Board moved to condition its continued approval of motor carrier bureau agreements on actions by the bureaus to reduce their collectively set rates to market-based levels. The Board asked parties to suggest a methodology to effect a reduction

STB Ex Parte No. 656, et al.

of class rates to prevailing levels, but no bureau (or other party) responded with a workable approach. Accordingly, in EC-MAC-II, the Board switched to a truth-in-rates approach, requiring dissemination of information about the actual competitive pricing environment.

Upon review, we are not satisfied that the truth-in-rates measure adequately addresses the adverse effects associated with allowing carriers to collectively set benchmark rates with immunity from the antitrust laws. We believe that the threat of antitrust prosecution, and the availability of treble damages, will be far more effective. It will directly address the public interest concerns relating to carriers' ability to signal actual rate movements through GRIs, and to maintain the artificial pricing "cushion" that class rates can facilitate that is neither cost-based nor market-based.

We believe this action is necessary and appropriate to address the public interest as articulated in 49 U.S.C. 13101. The public interest in fair competition and reasonable rates [section 13101(a)(2)(A)] is paramount here and should not conflict with other national policies regarding motor carrier transportation. Maximizing competition in the motor carrier industry should not lead to destructive competition or predatory pricing [section 13101(a)(1)(D)]. Collective ratemaking does not advance service to small communities [section 13101(a)(2)(G)], as rate bureaus are not authorized under section 13703(a)(1) to address service, individual markets, or the way that carriers respond to one another's rates.

The connection between antitrust immunity for collective ratemaking and the furtherance of other statutory policies, such as adequate profits, fair wages and working conditions [section 13101(a)(2)(F)] and safety [section 13101(a)(2)(I)] is tenuous at best. The fact that a carrier posts higher earnings (at the expense of its customers) does not mean that it will pay its employees more or that it will operate a safer fleet of trucks. It should be noted that DOT, which regulates safety, does not express any concern that ending rate bureau approvals will adversely affect safety.

Nor do we believe that collective ratemaking is supported by the public's interest in motor carrier efficiency [section 13101(a)(2)(B) and (F)], as the bureaus suggest. The starting point for developing or negotiating rates need not and ought not be to set rates collectively. Trade associations for other industries commonly publish aggregated non-collectively set prices charged in markets without violating antitrust laws.[57] Almost all prices in our economy are set without reference to a collectively established baseline price, and, like DOJ and DOT, we see no reason why trucking rates should be an exception.

<u>Bus Transportation</u>

Collective activity by bus carriers differs from that of freight carriers. While the NBTA does not collectively establish fares for passengers, it does establish charges relating to the

---

[57] Report on the Functions of the Interstate Commerce Commission at 23.

handling of baggage and express packages. It also establishes rules relating to their handling. These rules are described in the Board's decision renewing approval of NBTA's agreement in the prior review cycle.[58]

As with the freight rate bureaus, we do not believe that antitrust immunity for the bus industry furthers sound transportation policy. We find unpersuasive NBTA's argument that immunity is necessary to allow small bus operators to compete with other available modes of transportation.[59] Cost efficiencies obtained through collective action are not appropriate if they harm consumers through their potential to increase charges or reduce competition for flexible travel rules.

NBTA members establish their passenger fares individually, and we see no reason why they should not also establish their baggage and express charges likewise. Although we have not received the same degree of interest with regard to bus immunity as we have regarding immunity for general freight carriers - which is not surprising given the difference between the typical bus user and the typical business using trucking services - there is no more reason to believe that bus package rates ought to be collectively set with antitrust immunity than freight rates for other types of motor carriers. We note that carriers in the airline industry set baggage charges, size limitations, and package rates individually without any apparent adverse effects on the public.

With respect to rules, those that are benign competitively do not need antitrust immunity and those that are not benign should not have such immunity. For example, rules that preclude competition on particular service terms could be struck down summarily if they were challenged on antitrust grounds. On the other hand, rules that clearly facilitate interchange without affecting rates and services would not raise antitrust issues. We need not, and will not, attempt to categorize all of NBTA's rules according to the degree to which they facilitate interchange and the degree to which they raise antitrust issues. Given deregulation, there is no public policy reason why any conduct by bus companies that would otherwise violate the antitrust laws should be immunized from those laws.

Accordingly, even though no party has specifically requested termination of our approval of NBTA's agreement, we believe this action is necessary to protect the public's interest in competition for favorable terms and conditions for bus transportation.

---

[58] Application of the National Bus Traffic Association Inc., for Extended Approval of its Conformed Agreement, Section 5a Application No. 9 (Amendment No. 8), slip op. at 2 (STB served May 24, 2002).

[59] See NBTA Comments filed May 24, 2005, in STB Ex Parte No. 656 at 1. NBTA's comments requesting renewal were filed late, accompanied by a motion to file out of time. The motion is granted.

STB Ex Parte No. 656, et al.

### Household Goods

The collective activity of household goods carriers also differs from that of motor freight carriers. The Household Goods Carriers' Bureau Committee (HGCBC) collectively considers both classifications and rates and does not separate classification from rates.[60] HGCBC publishes different tariffs for different categories of shipments and shippers, including shipments of certain categories of goods other than the personal effects of households even though only personal effects and property to be used in a dwelling are now subject to regulation by the Board.[61] As with motor carriage of other forms of less-than-truckload (LTL) freight, shippers using HGCBC carriers generally receive discounts off the collectively set rates.

The potential for the market to set more competitive rates is as great or greater for household goods as for general freight. There are a large number of household goods carriers – HGCBC alone had 1,988 signatories to its agreement in 2005 and the competition is intense enough to force carriers to discount their rates from the HGCBC-set bureau rates. Household goods carriage is likely to stay competitive, perhaps even more so than LTL freight carriage, because entry into household goods carriage requires less investment in terminals.[62] Because household goods carriage is structurally competitive, termination of our approval of collective ratemaking and consequent removal of antitrust immunity for household goods carriage should be just as beneficial for household goods shippers as for LTL freight shippers.

One significant difference between household goods carriage and freight carriage is that household goods carriers' rates remain subject to regulation, whether or not they are collectively established.[63] However, the typical householder is not in a position to mount a regulatory rate

---

[60] For background information on collective ratemaking by HGCBC, see its testimony filed April 24, 2000, in Section 5a Application No. 1 (Sub-No. 10), which HGCBC incorporated into its testimony in STB Ex Parte No. 656.

[61] HGCBC's agreement was originally approved when the statutory definition of "household goods" encompassed more than the personal effects of households. At that time, household goods shipments were commonly categorized and discussed in terms of three statutory categories or "provisos," only the first of which included the personal effects of households. Compare prior 49 U.S.C. 10102(11) (1994) with current 49 U.S.C. 13102(10).

[62] See HGCBC Comments, filed Apr. 24, 2000, in Section 5a Application No. 1 (Sub-No. 10), Statement of Joseph A. Habib, at 2-3.

[63] See 49 U.S.C. 13701(a)(1)(A) (a rate, classification, rule, or other practice related to transportation involving a movement of household goods must be reasonable). On behalf of its members HGCBC has sought and received Board approval of changes to its members' released rates program. See, e.g., Released Rates of Motor Common Carriers of Household Goods, 5 S.T.B. 1147 (2001). Our decision today does not foreclose household goods carriers from petitioning as a group to establish other methodological changes regarding their liability for household good shipments. See 49 U.S.C. 14706(f)(1); see also United Mineworkers v.

(continued...)

- 19 -

STB Ex Parte No. 656, et al.

challenge. Thus, our rate review authority does not provide a strong basis for continued approval of collective activities of household goods carriers that may deprive their customers of the benefits afforded by the antitrust laws. Removing the regulatory approval of collectively set benchmark rates will provide confidence that rates will be at market-set levels.

HGCBC argues that application of the antitrust laws to collective ratemaking by household goods carriers is not needed to protect disadvantaged shippers. An HGCBC witness conducted a study of discounts showing that the average of the discounts received by small (cash on delivery, or "C.O.D.") shippers (presumably the ones needing protection) is about the same as that of large "national account" shippers.[54] The witness attributes this outcome to individual consumers shopping around for bargains to minimize an expense that can be a large part of a householder's budget. It may also be due to the ability of younger householders or those with few belongings to resort to self-help (i.e., moving their furniture themselves).

While the class as a whole may not be disadvantaged, an average discount level can conceal a wide range of discounts within the average, with some receiving lower discounts and some receiving higher ones, and we see no reason why even a small number of disadvantaged household goods shippers should be relegated to a collectively set base rate that most shippers can avoid. Our termination of approval of the HGCBC agreement and resulting removal of antitrust immunity for setting rates will infuse more competition into the system and remove any potential for household goods carriers to use that system to charge artificially high rates.

Like the SMCRC witness,[65] the HGCBC witness admits that there are differences in discounts but attributes them to differences in the cost of service (smaller shipments, shorter distances, etc.). Our response to witness Habib is the same – if shippers are receiving discounts from the class rates because of differences in the cost of service, rather than because the class rates exceed competitive levels, it is evidence that the class rates are not properly designed to reflect cost differences. For example, the fact that one household goods shipment moves over a longer distance than another should already be reflected in the bureau-set rates, if they are properly designed to reflect the transportation characteristics of shipments of household goods

---

(...continued)
Pennington, 381 U.S. 657 (1965) (Joint efforts to petition the government do not violate the antitrust laws.)

[64] See HGCBC comments, filed on Apr. 24, 2000, in Section 5a Application No. 1 (Sub-No. 10), Statement of Joseph A. Habib, at 6-8; HGCBC Opening Comments, filed Mar. 2, 2005, in STB Ex Parte No. 656, at 11 (updating witness Habib's study).

[65] See supra note 52, and the accompanying text.

(weight, distance, etc.).[66] It is not in the public interest to protect a collective rate-setting system that does not reflect recognized cost factors.

We do not agree that a collective rate-setting system helps to protect consumers from "fly by night" carriers that might otherwise prey on unsophisticated householders. We appreciate the efforts made by the American Moving and Storage Association (of which HGCBC is a part) to self-police and protect consumers from the unscrupulous practices of rogue movers. But an unscrupulous carrier is not obliged to participate in the bureau-system and could thus avoid any consumer-protection oriented bureau requirements. It is true that many household goods shipments involve individuals who may not be as well-versed in the law of contracts or commercial transactions as the carriers. However, given the significant expense of moving, householders can more appropriately protect themselves by obtaining multiple quotes, checking references, and arming themselves with information from FMCSA, the offices of most state attorneys general, and local better business bureaus.

### Classification

We are also terminating approval of the agreement of the NCC. Shipper advocacy groups have argued for years that the classification process is being used as an indirect form of collective ratemaking and is often manipulated to protect carrier revenues. Although we find only limited support for this contention in the record, we are concerned that the classification process not be abused once the immunized rate bureau system is dismantled. After more than 50 years of government approval of what otherwise would have been per se illegal price-fixing by the rate bureaus, it would be a natural and likely step for some carriers, perhaps unintentionally, to look for ways to use the classification process as a revenue protection device. Such a result would undo the deregulatory aims of today's decision and would perpetuate the prior harms to shippers. Thus, continued approval of NCC's agreement would be contrary to the public interest. Our action protects the shipping public's interest in competitively set rates and neutral classification ratings.

Abuse of the classification system would be very difficult for the Board to detect and police. There has been an upward trend in classification ratings in recent history, but it is virtually impossible to identify a single cause for the trend or to determine whether that cause is benign or not. Carriers could, under the present system, systematically and selectively seek ratings increases for those products where shippers have few transportation alternatives, without fear of the behavior being challenged as anticompetitive. It is difficult for the Board to detect this abuse without continual monitoring of the classification process, a function the Board is not well suited to perform.

---

[66] Bureau classifications and rates are not detailed enough to reflect all cost factors. For example, they do not reflect the presence or absence of urban congestion or traffic imbalances. Thus, back-haul shippers and shippers in less congested areas may pay lower rates that reflect the carriers' lower marginal cost of operating in those situations.

STB Ex Parte No. 656, et al.

The best way to ensure that such abuse of the classification process will not take place once the immunized rate bureau system is dismantled is to subject carriers involved in classification to the antitrust laws. DOJ has the infrastructure in place to monitor industries for anticompetitive conduct. And the threat of treble damages in civil suits brought by affected shippers would encourage carriers to carefully review the classification system with regard to its structure, conduct limitations, and potential for manipulation.

It is not our intent to discourage the classification process properly administered. We recognize that there are significant benefits associated with having a classification system.[67] Even the most vocal critics of NCC acknowledge that aspects of the classification system help simplify the process of quoting and negotiating rates.[68] To obtain a rate quote, shippers need only identify the commodity being shipped, the weight of the shipment, and where it is going. There is usually no need to discuss the density, stowability, handling, and liability characteristics of each individual shipment, as these factors are reflected in the rating assigned to each commodity.

Moreover, antitrust immunity is not necessary to create or maintain a classification system or systems. Classification essentially is a cost model, whereby shipment characteristics are identified and analyzed to determine the cost of hauling them. There are many industries that rely upon commercial entities to develop cost models to help determine the price that is charged for a particular service or product. Some of these cost models are based on actual cost data that are collected from industry participants through a third party and then appropriately aggregated for wider dissemination. Other cost models are based on estimated data from public sources. Still other models are proprietary systems developed and used by a single entity.

The vast majority of these cost models, even those that rely upon aggregated data collected from industry participants, exist without antitrust immunity. There is nothing about the motor carrier industry that requires that NCC's cost model, or any other competitive motor carrier cost model that is created, to operate outside of the antitrust laws. Rather, NCC and any competitors must ensure that its model complies with the antitrust laws' standards for, among other things, neutrality, aggregation and confidentiality.

---

[67] See the House Committee on Public Works and Transportation Report that accompanied the Motor Carrier Act of 1980, H.R. Rep. No. 96-1069, 96th Cong., 2d Sess. at 28:

> [T]he Committee is of the view that the commodity classification system currently in place is a useful tool for shippers, receivers and transporters of regulated freight [s]o all "know what they are talking about" thereby contributing to an efficient and economical transportation system.

[68] See DOJ Comments at 5. Also, NASSTRAC's comments indicate that the National Motor Freight Classification would remain useful to shippers even after Board approval of NCC's agreement is terminated.

STB Ex Parte No. 656, et al.

If challenged under the antitrust laws, the classification system would be judged under the "rule of reason." Contrary to the per se standard that would apply to rate bureau activity, the rule of reason is a highly fact-specific analysis that looks to the positive and negative effects of any challenged activity.[69] Thus, an antitrust court would consider arguments regarding how classification is pro-competitive or efficiency-enhancing. In 1998, the Board opined that there was a "sufficient possibility" that NCC would risk antitrust liability if it continued its classification activities without immunity. See EC-MAC 1 at 5 n.15. However, DOJ's comments in the present record are reassuring that the classification process can be reformed to comply with the antitrust laws, and that DOJ is willing to assist in this regard. Thus, we believe that the risk of antitrust liability can be minimized through consultation with DOJ and reformation of the classification process as appropriate.

Alternative Reforms.

We do not believe that increased regulatory oversight would be effective in preventing abuses of the classification system. Some commenters have suggested that the Board should mandate shipper voting rights on NCC's board. It is not clear that we have the authority to mandate such a condition.[70] However, even if we do have that authority, such a condition would not be sufficient to solve the perceived problem of structural bias or ensure that the interests of all shippers were represented. Similarly, we have no confidence that adjustments to NCC's non-linear density scale would address the core problem of the shippers – structural and entrenched bias in a system governed by carriers and immunized from the antitrust laws. In any event, we cannot conclude from this record that the density scale is, standing alone, inappropriate.[71]

---

[69] See DOJ Comments at 5 ("Legality of the classification system would depend on all relevant circumstances, including the methods used for classification, the factors considered, the decisionmaking process, and whether immunity for collective ratemaking is renewed.")

[70] Section 13703(a)(1)-(2) only authorizes "carriers" to enter into these agreements and seek Board approval; there is no mention of shippers in that section. Cf. 49 U.S.C. 10706(a)(5)(A) (providing for agreements between rail carriers' shippers to discuss compensation for a rail carrier's use of shipper-supplied rolling stock). We interpret the words "other persons" in 13703(a)(6) as referring to non-parties to an agreement who might otherwise be exposed to antitrust liability due to collective ratemaking, such as the staffers who help to administer bureaus, the numerous carriers who participate in their tariffs but are not involved in their governance, and other firms (including carriers) that help to administer the system by providing data, studies, etc.

[71] Density is the weight of a commodity expressed in pounds per cubic foot. NCC's Density Guidelines are a scale of suggested class ratings for a range of shipment densities. Generally speaking, assuming all other transportation factors remain constant, as density rises, classification ratings decrease and vice versa. The ratings range from 500 (for a density of less than 1 pound per cubic foot) to 50 (for a density of 50 or more pounds per cubic foot). Under NCC's non-linear density scale, density changes at the lower end of the density scale affect

(continued...)

- 23 -

STB Ex Parte No. 656, et al.

Finally, it seems ill-advised to try to micro-manage the process solely to protect carriers in a largely deregulated industry from the antitrust laws that apply to other unregulated industries.

Continued Approval of NCC's Agreement Does Not Further Transportation Policies.

Our decision to terminate NCC's approval is consistent with the motor carrier transportation policy at 49 U.S.C. 13101. A motor carrier classification system that is completely subject to the forces of competition and the antitrust laws encourages sound economic conditions as well as the development of reasonable rates.[72] Our chief concern — that classification not be used to stifle competition among motor carriers following the demise of the rate bureau system — reflects a policy of deterring unfair competitive practices.[73] Termination of approval is consistent with our policy goal to meet the needs of shippers and other consumers of motor carrier services.[74] Moreover, to the extent our decision facilitates the entry of competitors to NCC that might devise different ways of determining the transportation characteristics of commodities, we believe it will increase the variety of pricing options available to both carriers and shippers.[75] In sum, our action today terminating NCC's approval is fully supported by the regulatory policy goals that Congress has instructed us to pursue.

Other Collective Bureau Activities.

The bureaus argue that they conduct other beneficial collective activities – including establishment of through rates, joint rates and divisions, and the publication of mileage guides – that they claim would be at risk without antitrust immunity. We agree that some of these activities may be useful, or at least benign and not contrary to the public interest. But to the extent those activities do not affect rates, services, or competition, they do not need antitrust immunity in order to be continued. If the bureaus are in doubt about the likelihood of exposure to antitrust liability for those activities, they may take advantage of the business review

---

(...continued)

classification ratings far more than those at the higher end of the scale. The shipper organizations contend that this approach penalizes shippers carrying light density items, and gives carriers a greater incentive to pursue upwards ratings adjustments than shippers have to pursue downward adjustments. NCC contends that the non-linear scale accurately reflects the impact of density changes on each end of the scale.

[72] See 49 U.S.C. 13101(a)(1)(C) and (D).

[73] 49 U.S.C. 13101(a)(1)(D).

[74] 49 U.S.C. 13101(a)(2)(C).

[75] 49 U.S.C. 13101(a)(2)(D).

- 24 -

Case 1:07-cv-01638-RBW    Document 3-3    Filed 09/27/2007    Page 48 of 60
STB Ex Parte No. 656, et al.

procedure administered by DOJ's Antitrust Division[76] or consult other advisors regarding the bounds of permissible activity for collaboration among competitors.

The bureaus argue that at least some risk of antitrust litigation would attach and that antitrust immunity should be retained to avoid chilling these beneficial activities. However, as one court has observed, "[i]t is not realistic to expect a flood of antitrust lawsuits attacking a substantially procompetitive agreement."[77] Thus, we believe that the risk of chilling beneficial activity is small, as long as the bureaus put safeguards in place to avoid improper collusion, an effort that is standard among other industry associations. Terminating antitrust immunity will remove the potential to use an otherwise beneficial or benign activity to facilitate collusion in the provision of rates and services.

NCC argues that trade associations in other industries have run afoul of the antitrust laws for engaging in activities related to the exchange of price-related information (including cost or profit data), development of terms or conditions of sale, methods of distribution, joint research, and product standards and certification programs.[78] However, these well-known risks are faced by trade associations in every other industry. The bureaus should be no more deterred from pursuing beneficial activity than these other associations. With guidance from antitrust counsel and possibly DOJ, the bureaus should be able to work out a procedure to gather "price-related information" in the form of historical information about actual market rates in a way that minimizes antitrust risks. The remaining activities cited by NCC are either rightfully disfavored under antitrust law because they relate to rates and services, or are not conducted by the bureaus.

Through Routes, Joint Rates, and Divisions.

The bureaus assert that small carriers need antitrust immunity in order to expand their service through interline arrangements with other carriers.[79] However, motor carriers can

---

[76]  See DOJ's comments filed Dec. 2, 2005, in STB Ex Parte No. 656 (Sub-No. 1), at 6. See also DOJ/Federal Trade Commission "Antitrust Guidelines for Collaboration Among Competitors," available on the FTC's website (www.ftc.gov). While not a shield against antitrust litigation, a favorable business review letter from DOJ will afford significant guidance on permissible activity. Because the DOJ business review process can take some time to complete, interested bureaus may wish to file requests with DOJ as early as possible in the 120-day transition period provided in this decision.

[77]  Republic Airlines, Inc. v. Civil Aeronautics Board, 756 F.2d 1304, 1317 (8th Cir. 1985).

[78]  See Rebuttal Comments filed April 21, 2005, in STB Ex Parte No. 656, Rebuttal Statement of William W. Pugh, at 5-6.

[79]  See, e.g., HGCBC Comments filed April 24, 2000, in Section 5a Application No. 1 (Sub-No. 10), which HGCBC incorporated into its testimony in STB Ex Parte No. 656.

- 25 -

STB Ex Parte No. 656, et al.

efficiently establish through routes, joint rates, and divisions without antitrust immunity. The interchange of traffic is nothing more than a partnership or contractor/subcontractor arrangement, whereby the carrier contracting with the shipper arranges for another carrier to conduct part of the movement. In our economy, the lack of need for collective action is demonstrated every time a contractor contracts independently with a subcontractor. We see no reason why motor carriers have a special need for antitrust immunity in order to cooperate with other motor carriers for interlining purposes.[80]

The bureaus' argument does not distinguish between the economic terms of interchange (rates, divisions, services, territories, participants, etc.), which involve competition issues, and other terms of interchange that do not involve competitive concerns. While the negotiation of joint endeavors always involves some cost element, the economic terms of joint endeavors should be no more difficult to negotiate in the motor carrier industry than in any other industry, as long as the associated transaction costs can be kept to a minimum. The minimization of interchange transaction costs may require some standardization in other interchange terms or conventions, such as billing practices, contract formats, damage recovery procedures, and computer programs to discover and arrange for the terms of interchange. This type of standardization does not require antitrust immunity, however, because it does not affect price or service competition between the interchanging carriers.[81]

Mileage Guides.

Rate bureaus also publish mileage guides. Like standard ways of measuring time and temperature, standard mileage guides can facilitate operations and thereby reduce costs without affecting competition. There are minimal antitrust risks associated with the collective publication and adoption of mileage guides, and no party has argued to the contrary.

Rules.

The bureaus, particularly NCC, also establish a variety of rules that indirectly affect the provision of service. In the prior review cycle, NCC provided an abstract of its rules.[82] Some rules may lower the cost of service without affecting competition. However, like all industry associations, the bureaus must refrain from establishing rules that tend to standardize terms or

---

[80] As the Board observed in EC-MAC-I, 3 S.T.B. at 931 n.16, citing Petition to Delay Applic. of Direct Connector Requirement, 367 I.C.C. 886 (1983), aff'd sub nom. American Short Line R.R. Ass'n v. United States, 751 F.2d 107 (2d Cir. 1984), "procedures can be feasibly developed to permit 'direct connectors' to set joint rates without antitrust immunity."

[81] See DOJ's Comments filed Dec. 2, 2005, in STB Ex Parte No. 656 (Sub-No. 1), at 6-7.

[82] See NCC Comments, filed Jan. 29, 1995, in Section 5a Application No. 61, at 6-9.

- 26 -

STB Ex Parte No. 656, et al.

conditions on which carriers should be competing, or rules that hinder a particular carrier's ability to compete. Following this decision, it will be incumbent upon the bureaus to conduct a review of their rules to determine which can be retained, subject to the antitrust laws.

Activities Outside Scope of Section 13703.

This termination of approval of bureau agreements does not affect beneficial bureau activities that do not come within the scope of activities covered under 49 U.S.C. 13703. Our approval and the resulting antitrust immunity applied only to those activities that are specified in section 13703(a)(1)(A)-(G). While we will not attempt to specify those bureau activities that fall outside of the section, we recognize the probability that there are such activities.

### Section 5a Application No. 46 (Sub-No. 20)

Our action terminating approval of all remaining motor carrier bureaus renders moot the applications of SMCRC and other bureaus for geographic expansion of their approved activities.

### CONCLUSION

For the reasons given above, we find that termination of our approval of the 11 remaining bureau agreements is necessary to protect the public interest. The resulting removal of antitrust immunity should ensure a competitive motor carrier industry.

This action will not significantly affect either the quality of the human environment or the conservation of energy resources.

It is ordered:

1. The Board's approval of the agreements of the 11 extant motor carrier bureaus is terminated.

2. The applications for geographic expansion to nationwide authority in STB Section 5a Applications No. 46 (Sub-No. 20) (SMCRC), No. 34 (Amendment No. 8) (Middlewest Motor Freight Bureau, Inc.), No. 22 (Amendment No. 7) (Pacific Inland Tariff Bureau, Inc.), No. 60 (Amendment 10) (Rocky Mountain Motor Tariff Bureau, Inc.), and No. 25 (Amendment No. 8) (The New England Motor Rate Bureau, Inc.) are dismissed as moot.

- 27 -

STB Ex Parte No. 656, et al.

3. This decision will be effective September 4, 2007.

By the Board, Chairman Nottingham, Vice Chairman Buttrey, and Commissioner Mulvey.

Vernon A. Williams
Secretary

- 28 -

STB Ex Parte No. 656, et al.

APPENDIX
THE PARTIES AND THEIR POSITIONS

I. STB Ex Parte No. 656

There were three rounds of comments in STB Ex Parte No. 656, all of which were received before the (Sub-No. 1) proceeding was commenced to separately consider NCC's agreement. The commenters' positions and arguments are summarized below.

Opening Comments. Eleven motor carrier bureaus submitted opening comments asking for renewal of their agreement approval: the ten collective ratemaking bureaus; and NCC (comment submitted jointly with its unregulated parent, the National Motor Freight Traffic Association, Inc.), which develops commodity classifications but does not set rates.

The bureaus' arguments can be summarized as follows:

• As a group, the bureaus argued that (1) Congress supports continued antitrust immunity; (2) the agreements currently in place should remain approved because the bureaus have fully complied with all conditions previously imposed in the public interest and nothing has changed in the short period since the Board's last approval; and (3) the bureaus facilitate interlining, uniform packaging, and efficient operations.

• The rate bureaus focused on arguing that: (a) collective "benchmark" rates facilitate price and service competition; (b) there is no reason to believe that the collectively set rates are unreasonably high; and (c) small and medium size carriers need collective ratemaking to develop rates and to compete against larger trucking firms. The SMCRC defended the accuracy of its costing procedures in motor carrier general rate increase dockets. HGCBC submitted data allegedly demonstrating that individual shippers do not receive smaller discounts from the class rates than government or large national account shippers.

• NCC focused on arguing that: (i) the collective classification system serves the useful function of grouping commodities according to their transportation characteristics and thereby preventing rate discrimination and internal cross-subsidies; (ii) Congress has recognized the value of the classification system; and (iii) to avoid the risk of antitrust prosecution, antitrust immunity is necessary for all NCC functions.

NCC was the only bureau that attracted individually focused opposition to its renewal. Numerous one-page comments opposing renewal of that bureau were posted on the Board's

- 29 -

STB Ex Parte No. 656, et al.

website. Except for correspondence from several Members of Congress,[83] almost all of these comments were from entities connected with the business of providing lighting or lighting fixtures. Most comments proposed that NCC's agreement be changed to give shippers an equal vote with carriers in approving classification changes if the collective establishment of classifications is to continue to receive antitrust immunity from the Board.

NASSTRAC/NITL filed a statement urging the Board to terminate antitrust immunity for all bureaus, including NCC. NASSTRAC/NITL maintained that, under 49 U.S.C. 13703, there is no rebuttable presumption in favor of continued collective ratemaking. Those organizations argued that collective ratemaking is contrary to the public interest on the grounds that it results in higher rates for shippers without alternatives and the alleged harm cannot feasibly be cured through rate regulation by the Board. Alternately, those organizations urged the Board to impose conditions if the agency opts for renewal. For the rate bureaus, NASSTRAC/NITL proposed the following conditions: (1) adopt a rebuttable presumption that full undiscounted class rates are unreasonable; (2) make any automatic discounts mandatory minimum discounts; (3) prohibit increases in bureau class rates that increase member carriers' profits rather than cover cost increases; and (4) adopt procedures to increase transparency and shipper participation in rate bureau proceedings.

Concerning NCC, NASSTRAC/NITL maintained that, despite the reforms imposed by the Board during the prior review cycle, NCC's procedures continue to be biased toward increases in classification ratings. Those organizations criticized an alleged tendency to wear shippers down by simultaneously proposing small increases in the classification ratings of many different goods. To eliminate the alleged bias against shippers in the event that the Board opts to continue antitrust immunity for NCC, NASSTRAC/NITL proposed that the Board: (1) reconsider its recommendation, rejected in the prior review cycle, to allow shipper voting participation in NCC proceedings; (2) modify NCC's Density Guidelines[84] so as to eliminate an

---

[83] Congressmen Harold Ford, Bart Gordon, Pete Sessions, and Jim Cooper, and Senator Kay Bailey Hutchison sent letters expressing views on the Board's consideration of continued antitrust immunity for NCC.

[84] NCC's Density Guidelines are a scale of suggested class ratings for a range of shipment densities measured in pounds per cubic foot. The ratings decrease from 500 for a density of less than 1 pound per cubic foot to 50 for a density of 50 or more pounds per cubic foot. The Density Guidelines scale appears in: (a) NASSTRAC/NITL's Comments filed March 2, 2005, at 15-16; and (b) NCC's statement of its Policies and Directives, which appears on its website at www.nmfta.org and in Appendix A of the statement of Freight Transportation Consultants Association, Inc., filed November 18, 2005, in the (Sub-No. 1) proceeding. The guidelines are just the starting-point for an analysis that ends with the assignment of a final rating after factors other than density (stowability, etc.) are considered.

STB Ex Parte No. 656, et al.

alleged tendency to penalize movements of light density products, such as light bulbs;[85] (3) take steps to ensure that shippers know the precise issues involved in classification proceedings and that the issues are kept as narrow as possible;[86] and (4) take whatever other steps may be necessary to further facilitate shipper participation. As an alternative to shipper voting participation in NCC actions, NASSTRAC/NITL suggested formation under Board auspices of an advisory panel of shippers and carriers to consider additional reforms.

Reply Comments. On April 1, 2005, reply comments in support of renewal were filed by the Middlewest Motor Freight Bureau, Inc., NCC, Pacific Inland Tariff Bureau, Inc., Rocky Mountain Tariff Bureau, Inc.,[87] and SMCRC. The bureaus' replies took issue with the arguments and recommendations advanced by NASSTRAC/NITL. In response to the numerous comments from the lighting industry, NCC's reply defended its procedures for changing classifications and its controversial year 2004 increase in the classification ratings for lamps, lighting fixtures, and lighting parts. NCC's reply included a study allegedly showing that class rating increases have not been more frequent than decreases. NCC also replied that the nonlinear scale of its density guidelines is necessary to ensure that lighter density freight recovers a reasonable share of revenue needed.[88]

Reply comments in opposition to the bureaus' arguments for continuation of antitrust immunity were filed on April 1, 2005, by DOT (participating for the first time in this proceeding) and by NASSTRAC/NITL. DOT responded that: (1) competition is inherently better for shippers and consumers than collective action; (2) antitrust immunity is not necessary to protect small and medium size trucking firms; and (3) antitrust immunity is not necessary to give carriers the benefits of joint line rates or standard freight classifications. NASSTRAC/NITL's reply added a new proposal that bureaus be required to submit regular financial and membership reports to the Board to permit better monitoring of their activities.

---

[85] NASSTRAC/NITL maintain that the Density Guidelines reflect a "nonlinear" relationship between density and weight, whereby ratings rise more quickly as density falls than they fall as density rises. According to those organizations, this gives carriers more of an incentive to seek reclassifications due to density decreases than shippers have to seek reclassifications due to density increases.

[86] To illustrate this concern, NASSTRAC/NITL use a hypothetical example of NCC staff commencing an inquiry as to the density of all pots, pans, and cookware from all manufacturers when the only issue raised by a shipper or a carrier is the density of 10-inch Revere frying pans.

[87] On the same day, EC-MAC Motor Carriers Service Association, Inc., filed a statement concurring in the views of Rocky Mountain Tariff Bureau, Inc.

[88] In his reply statement at 8-9, William G. Pugh asserts that light density commodities tend to exhaust available space in trucks before they reach their load weight limit and that class ratings must reflect this.

- 31 -

STB Ex Parte No. 656, <u>et al.</u>

Rebuttal Comments. On April 21, 2005, rebuttal comments were filed. Comments supporting renewal were filed by: HGCBC; Middlewest Motor Freight Bureau, Inc.; NCC; Pacific Inland Tariff Bureau, Inc.; Rocky Mountain Tariff Bureau, Inc.; and SMCRC. Comments opposing renewal, or, alternately, favoring conditions, were filed by: DOT; NASSTRAC/NITL; and Acuity Brands Lighting. NASSTRAC/NITL challenged NCC's study developed to show that class rating increases have not been more frequent than decreases, arguing that: (1) it failed to analyze dockets that involved both increases and decreases in classification ratings; and (2) it did not consider the last 5 years of NCC's operations.

## II. STB Ex Parte No. 656 (Sub-No. 1)

There were two rounds of comments in STB Ex Parte No. 656 (Sub-No. 1). The parties' positions and major arguments are summarized below.

Opening Comments. Opening comments were submitted by: Acuity Brands Lighting; American Lighting Association; Bohman Industrial Traffic Consultants, Inc.; Congressman Nick J. Rahall, II; Freight Transportation Consultants Association, Inc.; Genlyte; Holtkoetter International, Inc.; NASSTRAC; National Confectioners Association; National Electrical Manufacturers Association; Pacific Coast Lighting; DOJ; and DOT. All of these comments opposed renewal of NCC's agreement, or supported renewal only with conditions, except for the supporting comments of Bohman Industrial Traffic Consultants, Inc., and Congressman Nick J. Rahall, II.

NCC's opponents continued to argue that NCC proceedings are biased against shippers, illustrating some of their arguments by discussing specific NCC dockets involving lighting products,[89] ceiling fans with and without lighting fixtures,[90] tobacco products,[91] and candy and gum.[92] One allegation was that upward bias in ratings is inevitable because NCC is controlled by carriers and carriers have no financial incentive to propose reclassifications that result in lower ratings. NASSTRAC renewed its argument that NCC's density guidelines are a source of bias against shippers and added an allegation that rated densities can be overstated when commodities of differing density are mixed and moved on the same pallet.[93] NASSTRAC also

---

[89]   See the comments of: Acuity Brands Lighting, American Lighting Association; Genlyte; Holtkoetter International, Inc.; National Electrical Manufacturers Association; and Pacific Coast Lighting.

[90]   See NASSTRAC Comments.

[91]   See Freight Transportation Consultants, Inc Comments.

[92]   See National Confectioners Association Comments.

[93]   NASSTRAC attributed this problem to an NCC rule supposedly requiring that, when different articles are combined or attached to each other for shipment, the charge reflect the class for the highest classed article of the combination. See NASSTRAC's comments, at 6.

STB Ex Parte No. 656, et al.

renewed its argument that the scope of NCC proceedings can be unduly broad, supporting its position by pointing to a docket involving ceiling fans with lighting fixtures.[94]  Another complaint was that NCC wears down opponents by repeatedly bringing requests for increased ratings even though the transportation characteristics of the commodities at issue had allegedly not changed.

The Freight Transportation Consultants Association, Inc. (FTCA) focused on NCC's Value Guidelines.[95]  According to FTCA, the Value Guidelines are subject to misuse because they imply that classification ratings may be increased for shipment values that exceed a carrier's loss and damage limit.  FTCA noted that a liability limit of $25 per pound often applies.  FTCA pointed to two classification dockets where NCC was persuaded to disregard the class ratings in the Values Guidelines after shippers noted that carrier liability limitations would prevent shippers from recovering the shipment values corresponding to the ratings in the guidelines.

DOJ's comments recognized the usefulness of freight classification but oppose continued antitrust immunity for NCC.  According to DOJ, a classification system such as NCC's can provide useful information concerning the transportation characteristics of commodities and framework of reference that can simplify the process of quoting and negotiating rates.  After recognizing these benefits, DOJ stated that NCC should be subjected to the same antitrust scrutiny that applies to other industries adopting classification systems or standards.  DOJ noted that, if NCC were to seek greater certainty regarding potential liability, it can take advantage of the Antitrust Division's business review procedure.  DOJ refrained from commenting on the likely outcome of such a review, stating only that it "would depend on all relevant circumstances, including the methods used for classification, the factors considered, the decision-making process, and whether immunity for collective ratemaking is renewed [footnote omitted]."[96]

---

[94]  In that docket, a shipper asked NCC to create a new classification that would encompass shipments of ceiling fans with or without lighting fixtures and replace the existing classification encompassing ceiling fans alone.  NASSTRAC argues that the NCC's staff improperly sought a broad range of information about the density and other transportation characteristics of shipments of ceiling fans with and without lighting fixtures and that NCC should have ruled simply that "ceiling fans" includes shipments with or without lighting fixtures, without changing the existing ratings.

[95]  NCC's Value Guidelines present a scale of class ratings corresponding to a range of shipment values per pound.  The ratings range from 50 for a value/pound of $.99 to 500 for a value/pound of $122.02.  The Value Guidelines scale appears in NCC's statement of its Policies and Directives, which is reproduced in Appendix A of the statement of Freight Transportation Consultants Association, Inc., filed on November 18, 2005, and on NCC's website at www.nmfta.org.

[96]  DOJ Comments, at 5.

- 33 -

STB Ex Parte No. 656, et al.

To deal with the alleged problems discussed above, NCC's opponents, with NASSTRAC taking the lead, suggested reforms in the event that the Board opts to continue antitrust immunity, as follows: (1) grant voting rights to shippers; (2) create an advisory group of shippers and carriers to work out changes in NCC procedures and standards; (3) outsource classification to an academic institution; (4) eliminate the nonlinear density scale in NCC's Density Guidelines; (5) amend NCC's Value Guidelines to require that, in applying its Value Guidelines, NCC must adopt whatever liability limit that is found in the docket record to apply to the commodity at issue, rather than its market value (FTCA's proposal); (6) terminate rules that allegedly inflate the class rating when commodities of differing density are mixed and moved on the same pallet; (7) require NCC to make its enquiries as narrow as possible; and (8) require that carriers proposing a classification change make a prima facie case for change, with supporting, accessible documentation, before a proceeding is initiated and shippers are required to submit information.

NCC's Reply. On December 22, 2005, NCC filed its reply comments. NCC argued that neither its procedures nor the arbitration process favors the carriers. According to NCC, participation in its dockets is not difficult or expensive for shippers because they need only provide representative information concerning the recognized characteristics of their shipments and shippers are given ample opportunity to provide this information. NCC submitted comments from three shippers, an association of shippers, and two shipper consultants supporting NCC and the classification process. NCC opposes NASSTRAC's proposals to create an advisory group of shippers and carriers to work out changes in NCC procedures and standards, to outsource classification to an academic institution, and to grant voting rights to shippers.

NCC disputed assertions that NCC's dockets burden shippers by being unduly broad. NCC maintains that the classification process inevitably involves some complexity, in that: (1) classifications may not be created or changed without studying the transportation characteristics considered to be relevant by the Board; and (2) classifications cannot feasibly be created for single articles within a commodity group (for example, 10-inch Revere frying pans within a broader "pans" commodity group). NCC disputed NASSTRAC's assertion that it automatically requests information as to all transportation characteristics of all types of a commodity when only one transportation characteristic of a particular commodity is at issue and states that NASSTRAC provided no example where this has actually occurred.

NCC defended the nonlinear scale in its Density Guidelines against NASSTRAC's allegation that it biases NCC proceedings in favor of classification increases. According to NCC, the relationship between density and transportability is inherently nonlinear. NCC also argued that it is proper to have a density scale that allows carriers to maintain their revenues as the density of commodities decreases. NCC updated an analysis of classification actions undertaken during the prior review cycle to include information about year 2005.

- 34 -

STB Ex Parte No. 656, et al.

NCC defended its Value Guidelines against FTCA's proposed amendment to keep them from being used to increase classification ratings when shipment values exceed a carrier's loss and damage limit. NCC maintained that shipper liability limitations in motor carrier ratemaking tariffs should have no relevance to the establishment of a proper classification, reasoning that (1) what really matters in commodity classification is the potential risk of loss from transportation of a commodity (without tariff limitations) and (2) market value per pound is a recognized factor to be considered in estimating such risk. NCC maintained that FTCA's proposal is unworkable because motor carrier loss and damage limits vary significantly from the $25 per pound claimed by FTCA to be typical.

NCC discussed each of the specific dockets cited by shipper interests as illustrating the need for reform. NCC argued that the Board's procedural guidelines were followed in each docket and that the complaining shippers have not pursued the available remedies of arbitration and Board review.[97] As to the controversial year 2004 lighting products docket, NCC argued that: (1) it had to rely on its own comprehensive "raw data" on the transportation characteristics of the shipments being studied because the industry did not submit raw data; (2) NCC was not obliged to show that the transportation characteristics of lighting products had changed; (3) the pre-existing classification did not reflect the wide range of densities for lamps and lighting fixtures; (4) NCC has adopted similar re-classifications to reflect wide density ranges in dockets involving other goods, one of which was upheld by the Board;[98] and (5) the new classification includes class reductions as well as increases and now allows shippers to obtain lower freight charges by "bumping."[99] Concerning the year 2005 docket involving ceiling fans with attached lights, NCC responded that the staff investigation did not encompass a change that was broader

---

[97] In particular, NCC stated (Comments, at 55):

Since the NCC's current Section 5a Agreement became effective, a total of 147 classification proposals have been considered and acted upon by the NCC and its Classification Panels. Arbitration was not sought in connection with any of these actions; not by NASSTRAC or anyone else [footnote omitted]. In fact, as already discussed herein, the lighting industry pointedly eschewed arbitration. And no one has challenged any classification action to the STB via protest or complaint.

[98] NCC cited Protest and Petition for Suspension and Investigation (National Motor Freight Classification), STB Docket No. ISM 35007 (STB served Jan. 20, 2000), at 2, a proceeding involving textiles.

[99] "Bumping" allows shippers to artificially add weight to a shipment to decrease its classification rating by increasing its density. Increased weight will ordinarily lead to a higher charge, if nothing else changes. However, if the shipment is on a class density borderline, the charge-increasing effect of the increased weight may be more than offset by the charge-decreasing effect of the decreased classification rating, and the final result may be a lower charge.

STB Ex Parte No. 656, et al.

than that sought by the carriers, that NCC staff worked closely with shippers, and that NCC twice voluntarily postponed a decision to allow analysis of data submitted by shippers.

Responding to the comments of DOJ, NCC noted that in 1980 DOJ advised the Motor Carrier Ratemaking Study Commission that freight classification would be vulnerable to antitrust attack absent immunity and cites an article from an American Bar Association publication in support of this position.

Supplemental Pleadings. On March 24, 2006, NCC, having been granted permission by the Board, filed Supplemental Reply Comments responding to a letter dated February 21, 2006, from five members of Congress urging the Board to terminate NCC's antitrust immunity.[100] NCC's reply focused on defending recent increases in the classification ratings of candy.[101]

### III.  Section 5a Application No. 46 (Sub-No. 20)

SMCRC filed initial and rebuttal statements in support of its request.  Reply comments in opposition to SMCRC were filed by DOT, NITL, and two regional rate bureaus, Rocky Mountain Tariff Bureau, Inc. and EC-MAC Motor Carrier Service Association, Inc.

---

[100]  The five members of Congress were:  Representative Danny K. Davis, Representative Charles W. Dent, Representative Rahm Emanuel, Representative Paul E. Gillmor, and Representative Ralph M. Hall.

[101]  The Board also received a letter from Representative Nick J. Rahall II, urging the Board to reach a decision and defending NCC's antitrust exemption.

STB Ex Parte No. 656, et al.

Two shipper organizations, The National Electrical Manufacturers Association and the National Small Shipments Traffic Conference, Inc., filed reply comments supporting SMCRC subject to conditions, as follows: (1) collection of the full (undiscounted) SMCRC class rates would be presumptively unreasonable; (2) SMCRC must continue the 20% class rate reduction that the bureau adopted to address the Board's earlier expressed concerns over inflated collective rates and to increase this discount if other bureaus do not survive; (3) SMCRC must adopt procedures to increase the participation and rights of shippers in internal bureau proceedings (similar to the procedures that the Board forced on the National Classification Committee in another proceeding); (4) the Board would review SMCRC's agreement after 3 years, rather than the 5-year maximum period allowed by statute; (5) the Board would adopt reporting conditions (noted below[102]); and (6) the Board would take steps to help to ensure reasonable pricing of SMCRC's Czar-Lite service.

On October 27, 2004, the Board held an oral argument. The transcript is available on the Board's web site at www.stb.dot.gov.

---

[102] In addition to a fallback 3-year review, DOT would require SMCRC to report on the number of bureaus still existing, the number of its members, the range and weighted average of discounts offered by its members, and would allow others to respond to these reports.

## BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

IN RE LTL TRUCKING ANTITRUST
LITIGATION

:
:
:
:
:

MDL No. _____

## REVISED CERTIFICATE OF SERVICE

I hereby certify that copies of Plaintiff Isaac Industries, Inc.'s Motion to Transfer

and for Pre-Trial Coordination or Consolidation of Related Actions to the District of

Columbia and Memorandum in Support of the Motion (with revised Schedule of Actions

and Certificate of Service) have been served on all parties listed below by e-mail where

possible and by express mail this 20th day of September, 2007.  Copies have also been

served on all district court clerks in the relevant jurisdictions.

Christopher M. Burke
Gregory Weston
**COUGHLIN STOIA GELLER RUDMAN &
ROBBINS, LLP**
655 West Broadway, Suite 1900
San Diego, CA 92101
Tel: 619-231-1058
E-Mail: Chrisb@csgrr.com

Larry W. Gabriel
Daniel J. Mulligan
**JENKINS MULLIGAN & GABRIEL, LLP**
78065 Main Street, Suite 202
La Quinta, CA 92253

Patrick J. Coughlin
**COUGHLIN STOIA GELLER RUDMAN &
ROBBINS, LLP**
100 Pine Street, Suite 2600
San Francisco, CA 94111
Tel: 415-288-4545
Fax: 415-288-4534
E-Mail: Patc@csgrr.com

Allan Steyer
Jeffrey H. Lowenthal
D. Scott Macrae
**STEYER LOWENTHAL BOODROOKAS
ALVAREZ & SMITH, LLP**
One California Street, 3rd Floor
San Francisco, CA 94111
Tel: 415-421-3400
Fax: 415-421-2234

E-Mail: asteyer@steyerlaw.com

**Counsel for Plaintiffs**
*Farm Water Technological Services, Inc., et al. v. Arkansas Best Corporation, et al.*
**Civil Docket No. 3:07-cv-01389-BEN-RBB**

Edward M Gergosian
**GERGOSIAN AND GRALEWSKI**
655 West Broadway
Suite 1410
San Diego, CA 92101
Tel: 619-237-9500
Fax: 619-237-9555
E-Mail: ed@gergosian.com

**Counsel for Plaintiffs**
*Dad's Products Company, Inc. v. Arkansas Best Corporation, et al.*
**Civil Docket No. 3:07-cv-01765-LAB-WMC**

David Randell Scott
**SCOTT + SCOTT – CT**
108 Norwich Ave., PO Box 192
Colchester, CT 06415
Telephone (860) 537-5537
Fax: 860-537-4432
E-Mail: DRScott@scott-scott.com

**Counsel for Plaintiffs:**
*Global Wire Inc., et al. v. Arkansas Best Corporation, et al.*
**Civil Docket No. 3:07-cv-01192-JCH**

Joseph H. Meltzer
Cassandra A. Murphy
Terrence S. Ziegler
**SCHIFFRIN BARROWAY TOPAZ &**
**KESSLER, LLP**
280 King of Prussia Road
Radnor, PA 19087
Tel: 610-667-7706
Fax: 610-667-7056
E-Mail: jmeltzer@sbtklaw.com

Chris A. Barker
**BARKER, RODEMS & COOK, PA**
400 N. Ashley Dr., Suite 2100
Tampa, FL 33602
Tel: 813-489-1001
Fax: 813-489-1008
Email: cbarker@barkerrodemsandcook.com

Ronald J. Berke
**BERKE, BERKE & BERKE**
420 Frazier Avenue
Chattanooga, TN 37405
Tel: 423-266-5171
Fax: 423-265-5307
E-Mail: Ronnie@berkeattys.com

**Counsel for Plaintiffs**
*Inkjetsinc.com of Florida, Inc. v. Arkansas Best Corporation, et al.*
**Civil Docket No.: 2:07-cv-00518-JES-SPC**

T. Christopher Tuck
Daniel Oakes Myers
Andrew Hoyt Rowell, III
**RICHARDSON PATRICK WESTBROOK &**
**BRICKMAN**
P.O. Box 1007
Mt. Pleasant, SC 29465
Tel: 843-727-6500
Fax: 843-216-6509
E-mail: ctuck@rpwb.com

Robert S Wood
**RICHARDSON PATRICK WESTBROOK &**
**BRICKMAN**
1037 Chuck Dawley Blvd, Bldg A
Mt. Pleasant, SC 29464
Tel: 843-727-6500
Fax: 843-216-6509
E-mail: bwood@rpwb.com

Mia Lauren Moses
Mark Charles Tanenbaum
**MARK C TANENBAUM, P.A.**
P.O. Box 20757
Charleston, SC  29413
Tel: 843-577-5100
Fax: 843-722-4688
E-Mail: mark@tanenbaumlaw.com

John P. Algar
**MARK C TANENBAUM LAW OFFICE**
241 E Bay Street
Charleston, SC  29401
Tel: 843-577-5100
Fax: 843-722-4888
john@tanenbaumlaw.com

**Counsel for Plaintiffs**
*Berle Enterprises Inc. & Berle Manufacturing Company*
**Civil Docket No.: 2:07-cv-02923-CWH**

Arthur L. Shingler, III
Hal Cunningham
**SCOTT + SCOTT**
Suite. 1500
600 B Street
San Diego, CA  92101
Tel: 619-233-4565
Fax: 619-233-4565
E-Mail: ashingler@scott-scott.com
hcunningham@scott-scott.com

Geoffrey M. Johnson
**SCOTT & SCOTT**
33 River Street
Chagrin Falls, OH  44022
Tel: 440-247-8200
Fax: 440-247-8275
E-Mail: gjohnson@scott-scott.com

**Counsel for Plaintiff**
*Computer Management International*
**Civil Docket No.: 1:07-cv-02640-KMO**

Robert J. Gralewski, Jr.
**GERGOSIAN & GRALEWSKI**
655 West Broadway
Suite 1410
San Diego, CA 92101
Tel: 619-237-9500
Fax: 619-237-9555
E-Mail: ed@gergosian.com

**Counsel for Plaintiff**
*Niagara Frontier Distribution Inc.*
**Civil Docket No.: 3:07-cv-01728-W-JMA**

Gregory Paul Hansel
**PRETI, FLAHERTY, BELIVEAU &**
**PACHIOS LLP**
P.O. Box 9546
Portland, ME  04112-9546
Tel: 207-791-3000
Fax: 207-791-3111
E-Mail: ghansel@preti.com

**Counsel for Plaintiff**
*Tex Tech Industries Inc.*
**Civil Docket No.: 2:07-cv-00157-DBH**

Lisa J. Rodriguez
**TRUJILLO, RODRIGUEZ & RICHARDS,**
**LLC**
8 Kings Highway West
Haddonfield, New Jersey  08033
Tel: 856 795-9002
Fax: 856-795-9887
E-Mail: lisa@trrlaw.com

**Counsel for Plaintiff**
*Lawrence F. Thompson*
**Civil Docket No.: 1:07-cv-04271-JBS-JS**

Dennis James Stewart
**HULETT HARPER STEWART LLP**
550 West C Street, Suite 1600
San Diego, CA  92101
Tel: 619-338-1133
Fax: 619-338-1139
E-Mail: Dstewart@hulettharper.com

**Counsel for Plaintiff**
*C & L Trading of Miami, Inc.*
**Civil Docket No.: 3:07-cv-01764-J-RBB**

Jeffrey Todd Thomas
**GIBSON DUNN & CRUTCHER LLP**
3161 Michelson Drive
Irvine, CA 92612-4412
Tel: 949-451-3800
Fax: 949-451-4220
Email: jtthomas@gibsondunn.com

**Counsel for Defendant *Con-Way, Inc.***

Richard J. Favretto
**MAYER, BROWN, ROWE & MAW, LLP**
1909 K Street N.W.
Washington, DC 20006-1101
Tel: 202-263-3250
Fax: 202-263-5250
E-Mail: rfavretto@mayerbrown.com

John Nadolenco
**MAYER, BROWN, ROWE & MAW, LLP**
350 South Grand Avenue, 25th Floor
Los Angeles, CA 90071-1503
Tel: 213-229-5173
Fax: 213-576-8133
E-Mail: jnadolenco@mayerbrown.com

**Counsel for Defendant**
**_Arkansas Best Corp._**

G. Brian Jackson
**MILLER & MARTIN PLLC**
1200 One Nashville Place
150 Fourth Avenue North
Nashville, TN 37219
Tel: 615-744-8505
Fax: 615-256-8197
E-Mail: bjackson@millermartin.com

Margaret M. Zwisler
**LATHAM & WATKINS LLP**
555 11th Street, N.W., Suite 1000
Washington, D.C. 20004-1304
Tel: 202-637-1092
Fax: 202-637-2201
E-Mail: Margaret.zwisler@lw.com

Charles H. Samel
**LATHAM & WATKINS LLP**
633 W. Fifth Street, Suite 4000
Los Angeles, CA 90071-2007
Tel: 213-891-8285
Fax: 213-891-8763
E-Mail: charles.samel@lw.com

**Counsel for Defendant**
**_Averitt Express Inc._**

Samuel R. Miller
**SIDLEY AUSTIN LLP**
555 California Street, Suite 2000
San Francisco, CA 94104-1715
Tel: 415-772-7447
Fax: 415-772-7400
E-Mail: srmiller@sidley.com

Steven A. Ellis
Michael B. Goodman
**SIDLEY AUSTIN LLP**
555 West Fifth Street
Los Angeles, CA 90013
Tel: 213-896-6650
Fax: 213-896-6600
E-Mail: sellis@sidley.com

**Counsel for Defendant**
*FedEx Corp.*

Thomas F. Cullen, Jr.
**JONES DAY**
51 Louisiana Avenue, N.W.
Washington, DC 20001-2113
Tel: 202-879-3924
Fax: 202-626-1700
E-Mail: tfcullen@jonesday.com

John J. Hyland
Thomas H. Sear
**JONES DAY**
222 East 41st Street
New York, NY 10017-6702
Tel: 212-326-3680
Fax: 212-755-7306
E-mail: thsear@jonesday.com

**Counsel for Defendant:**
*New England Motor Freight, Inc.*

David B. Hall
**BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, P.C.**
1600 Wachovia Tower
420 North 20th Street
Birmingham, AL 35203
Tel: 205-244-3831
Fax: 205-488-3831
E-mail: dhall@bakerdonelson.com

John G. Calender
**BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, P.C.**
Lincoln Square
555 Eleventh Street, N.W., 6th Floor
Washington, DC 20004
Tel: 202-508-3474
Fax: 202-220-2274
E-Mail: jcalender@bakerdonelson.com

**Counsel for Defendant**
*R+L Carrier, Inc.*

William P. Quinn, Jr.
Mark P. Edwards
**MORGAN, LEWIS & BOCKIUS, LLP**
1701 Market Street
Philadelphia, PA 19103
Tel: 215-963-5775
Fax: 215-963-5001
E-Mail: wquinn@morganlewis.com

**Counsel for Defendants**
*Jevic Transportation, Inc. and*
*Sun Capital Partners IV, LLC*

Leiv H. Blad
Boyd T. Cloern
**CLIFFORD CHANCE US LLP**
2001 K Street, N.W.
Washington, DC 20006
Tel: 202-912-5122
Fax: 202-912-6000
E-Mail: leiv.blad@cliffordchance.com

Guillermo Marrero
**INTERNATIONAL PRACTICE GROUP, P.C.**
600 West Broadway, Suite 1520
San Diego, CA 92101
Tel: 619-515-1482
Fax: 619-515-1481
E-Mail: gmarrero@ipglaw.com

**Counsel for Defendant**
*Old Dominion Freight Line, Inc.*

William Perry Brandt
**BRYAN CAVE LLP**
One Kansas City Place
1200 Main Street, Suite 3500
Kansas City, MO 64105-2100
Tel: 816-374-3206
Fax: 816-855-3206
E-Mail: perry.brandt@bryancave.com

**Counsel for Defendant**
*SAIA, Inc.*

**Southern Motor Carriers Rate Conference, Inc.**
c/o Registered Agent
Jack E. Middleton
500 Westpark Drive
Peacetree City, GA 30269

**FedEx National LTL, Inc.**
c/o Registered Agent
C T Corporation System
75 Beattie Place
Greenville, SC 29601

**Southeastern Freight Lines, Inc.**
c/o Registered Agent
W. Tobin Cassels, III
420 Davega Road
Lexington, SC 29073

**Estes Express Lines, Inc.**
c/o Registered Agent
Corporation Service Company
5000 Thurmond Mall Blvd.
Columbia, SC 29201

**Old Dominion Freight Line, Inc.**
c/o Registered Agent
C T Corporation System
75 Beattie Place
Greenville, SC 29601

**UPS Freight, Inc.**
c/o Registered Agent
Corporation Service Company
5000 Thurmond Mall Blvd.
Columbia, SC 29201

**Con-Way, Inc.**
2855 Campus Drive, Suite 300
San Mateo, CA 94403

**FedEx Corporation**
942 South Shady Grove Road
Memphis, TN 38120

**Averitt Express, Inc.**
c/o Registered Agent
National Registered Agents, Inc.
2 Office Park Court
Columbia, SC 29223

**R & L Carriers, Inc.**
c/o Registered Agent
Ralph L. Roberts, Sr.
600 Gilliam Road
Wilmington, OH 45177

**AAA Cooper Transportation, Inc.**
c/o Registered Agent
Registered Agents Solutions, Inc.
1040 Rock-N-Creek Road
Leesville, SC 29070

**New England Motor Freight, Inc.**
I-71 North Avenue East
Elizabeth, NJ 07201

**Saia Motor Freight Line, LLC**
c/o Registered Agent
C T Corporation
75 Beattie Place
Greenville, SC 29601

**Arkansas Best Corporation**
**ABF Freight Systems, Inc.**
3801 Old Greenwood Road
Fort Smith, AK 72903

**Con-Way Freight, Inc.**
110 Parkland Plaza
Ann Arbor, MI 48103

**Jervic Transportation, Inc.**
600-700 Creedk Road
Delanco, NJ 08075

**Sun Capital Partners IV, LLC**
5200 Town Center Circle, Suite 470
Boca Raton, FL 33486

**R+L Carriers, Inc.**
600 Gilliam Road
Wilmington, OH 45177

**United Parcel Service, Inc.**
55 Glenlake Parkway, NE
Atlanta, GA 30328

**Fed Ex Freight Corp.**
942 South Shady Grove Road
Memphis, TN 38120
USA

**Roadway Express, Inc.**
1077 Gorge Blvd.
Akron, OH 44309-0471

**Yellow Transportation, Inc.**
10990 Roe Ave.
Overland Park, KS
66211-1213

**Old Dominion Freight Lines, Inc.**
500 Old Dominion Way
Thomasville, NC 27360

**Saia, Inc.**
11465 Johns Creek Parkway, Suite 400
Duluth, GA 30097

**YRC Worlwide Inc.**
10090 Roe Avenue
Overland Park, KS 66211

**Overnite Corp**
UPS Corporate Headquarters
55 Glenlake Parkway, NE
Atlanta , GA30328
United States

**Watkins Motor Lines**
942 South Shady Grove Road
Memphis, TN 38120

**YRC Regional Transportation**
3517 Embassy Parkway
Akron, OH 44333

Tanya Chutkan

<u>BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION</u>
<u>REVISED SCHEDULE OF ACTIONS</u>

**In Re LTL Trucking Antitrust**                                    MDL No. _____
**Litigation**

<u>APPENDIX A</u>

**REVISED SCHEDULE OF ACTIONS**

| Caption | Civil Action No. | Venue | Date Filed | Judge |
|---|---|---|---|---|
| **Plaintiffs:** *Farm Water Technological Services, Inc., d/b/a Water Tech, C.B.J.T., Inc., d/b/a Agricultural Supply*<br><br>**Defendants:** *Arkansas Best Corporation; Averitt Express, Inc. Con-Way Inc.; FedEx Corporation; Jevic Transportation, Inc.; New England Motor Freight, Inc.; R+L Carriers, Inc.; SAIA, Inc.; SUN Capital Partners IV LLC; United Parcel Service, Inc.; YRC Worldwide, Inc.* | 07-cv-01389 | S.D. Cal. | July 30, 2007 | Hon. Roger T. Benitez |
| **Plaintiffs:** *Global Wire, Inc.; Wyre Wynd Life Wire, Inc.; Montgomery Wire Corp.* | 3:07-cv-1192 | D. Conn. | August 6, 2007 | Hon. Janet C. Hall |

| | | | | |
|---|---|---|---|---|
| **Defendants:** *Arkansas Best Corporation; Averitt Express, Inc. Con-Way Inc.; FedEx Corporation; Jevic Transportation, Inc.; Sun Capital Partners IV LLC; New England Motor Freight, Inc.; Old Dominion Freight Line, Inc.; R+L Carriers, Inc.; SAIA, Inc.; SAIA Motor Freight Line LLC; United Parcel Service, Inc;, YRC Worldwide, Inc.,* | | | | |
| **Plaintiff:** *Inkjets.com of Florida, Inc.*<br><br>**Defendants:** *Arkansas Best Corporation; Averitt Express, Inc. Con-Way Inc.; FedEx Corporation; Jevic Transportation, Inc.; Sun Capital Partners IV LLC; New England Motor Freight, Inc.; Old Dominion Freight Line, Inc.; R+L Carriers, Inc.; SAIA, Inc.; SAIA Motor Freight Line LLC; United Parcel Service, Inc.; YRC Worldwide, Inc.* | 2:07-cv-00518 | M.D. Fla. | August 16, 2007 | Hon. John E. Steele |
| **Plaintiffs:** *Berle Manufacturing Company; Berle Enterprises, Inc.* | 2:07-cv-2923 | D.S.C. | August 23, 2007 | Hon. C. Weston Houck |

| | | | | |
|---|---|---|---|---|
| **Defendants:** *Southern Motor Carriers Rate Conference, Inc.; AAA Cooper Transportation; Averitt Express, Inc.; Estes Express Lines, Inc.; FedEx National LTL, Inc.; Old Dominion Freight Line, Inc.; R&L Carriers, Inc.; Saia Motor Freight Line, L.L.C.; Southeastern Freight Lines, Inc.; UPS Freight; John Does I-X* | | | | |
| **Plaintiff:** *Computer Management International*<br><br>**Defendants:** *Arkansas Best Corporation; ABF Freight Systems, Inc.; Averitt Express, Inc. Con-Way Inc.; Con-Way Freight Inc.; FedEx Corporation; FedEx Freight Corporation; Jevic Transportation, Inc.; New England Motor Freight, Inc.; Old Dominion Freight Line, Inc.; R+L Carriers, Inc.; SAIA, Inc.; SAIA Motor Freight Line LLC; United Parcel Service, Inc; YRC Worldwide, Inc.* | 1:07-cv-02640 | N.D. Oh. | August 30, 2007 | Hon. Roger T. Benitez |
| **Plaintiff:** *Niagara Frontier* | 07-cv-01728 | S.D. Cal. | August 31, 2007 | Hon. Thomas J. Whalen |

| | | | | |
|---|---|---|---|---|
| *Distribution, Inc.*<br><br>**Defendants:** *Arkansas Best Corporation; ABF Freight Systems, Inc.; Averitt Express, Inc. Con-Way Inc.; Con-Way Freight Inc.; Estes Express Lines; FedEx Corporation; Old Dominion Freight Line, Inc.; SAIA, Inc.; SAIA Motor Freight Line LLC; United Parcel Service, Inc;, YRC Worldwide, Inc.* | | | | |
| **Plaintiff:** *Tex-Tech Industries, Inc.*<br><br>**Defendants:** *Arkansas Best Corporation; Averitt Express, Inc. Con-Way Inc.; FedEx Corporation; Jevic Transportation, Inc.; Sun Capital Partners IV, LLC; New England Motor Freight, Inc.; Old Dominion Freight Line, Inc.; R+L Carriers, Inc.; SAIA, Inc.; United Parcel Service, Inc; YRC Worldwide, Inc.* | 2:07-cv-00157 | D. Me. | September 5, 2007 | Hon. D. Brock Hornby |
| **Plaintiff:** *Lawrence F. Thompson* d/b/a *Top Floor* | 1:07-cv-04271 | D. N.J. | September 6, 2007 | Hon. Jerome B. Simandle |

| | | | | |
|---|---|---|---|---|
| *Home Improvements* <br> **Defendants:** *Arkansas Best Corporation; Averitt Express, Inc. Con-Way Inc.; FedEx Corporation; Jevic Transportation, Inc.; New England Motor Freight, Inc.; Sun Capital Partners IV, LLC; Old Dominion Freight Line, Inc.; R+L Carriers, Inc.; SAIA, Inc.; United Parcel Service, Inc;, YRC Worldwide, Inc.* | | | | |
| **Plaintiff:** *C & L Trading of Miami, Inc.* <br><br> **Defendants:** *Arkansas Best Corporation; Averitt Express, Inc.; Con-Way Inc.; FedEx Corporation; Jevic Transportation, Inc.; New England Motor Freight, Inc.; Old Dominion Freight Line, Inc.; R+L Carriers, Inc.; SAIA, Inc.; United Parcel Service, Inc; YRC Worldwide, Inc.* | 3:07-cv-1764 | S.D. Cal. | September 7, 2007 | Hon. Thomas J. Whelan |
| **Plaintiff:** *Dad's Product Co.* <br><br> **Defendants:** *Arkansas Best Corporation; ABF Freight* | 3:07-cv-1765 | S.D. Cal. | September 7, 2007 | Hon. Roger T. Benitez |

5

| | | | | |
|---|---|---|---|---|
| *Systems, Inc.; Averitt Express, Inc.; Con-Way Inc.; Con-Way Freight, Inc.; Estes Express Lines: FedEx Corporation; Old Dominion Freight Line, Inc.; SAIA, Inc.; SAIA Motor Freight Line, LLC; United Parcel Service, Inc; YRC Worldwide, Inc.* | | | | |
| **Plaintiff:** *Isaac Industries, Inc.*<br><br>**Defendants:** *AAA Cooper Transportation; Arkansas Best Corporation; ABF Freight Systems, Inc.; Averitt Express, Inc. Con-Way Freight, Inc.; FedEx Corporation; Jevic Transportation, Inc.; New England Motor Freight, Inc.; Sun Capital Partners IV, LLC; Old Dominion Freight Line, Inc.; R+L Carriers, Inc.; SAIA, Inc.; United Parcel Service, Inc;, YRC Worldwide, Inc., Estes Express Lines, Inc., Fed Ex Freight Corp, Fed Ex national LTL, Inc., Overnite, Corp., Roadway Express, Inc., SAIA Motor Freight Line, LLC, Southeastern Freight Lines, Inc., Watkins Motor Lines, Yellow* | 1:07-cv-01638 | D.D.C. | September 14, 2007 | Hon. Reggie B. Walton |

| *Transportation, Inc., YRC Regional Transportation, Inc.* | | | | |
|---|---|---|---|---|